RICHARD B., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, DIVISION OF FAMILY AND YOUTH SERVICES, Appellee.

No. S–10127.

Supreme Court of Alaska.

June 13, 2003.

---

48. *Kowalski v. Kowalski,* 806 P.2d 1368, 1373 (Alaska 1991).

Kathleen A. Murphy, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Christi A. Pavia, Assistant Attorney General, Bethel, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

In a termination of parental rights case, the father whose rights were terminated charges that there was a conflict of interest because the children's mother was represent-ed by a firm that had previously represented the father in a criminal matter that provided one of the bases for termination. The imprisoned father also challenges the superior court's decision denying his request to testify in person. We conclude that the superior court erred in allowing the conflicted firm to represent the mother despite its past relationship with the father, and we remand for a determination of the effect of this error on the father's case. On the issue of the father's request to be present at the trial, we find no error in the superior court's denial of the father's request for transport.

## II. FACTS AND PROCEEDINGS

Richard[1] and Leslie are the parents of three children, Cynthia, Violet, and Richard, Jr. In 1997 the Division of Family and Youth Services (DFYS or state) filed a petition alleging the children to be in need of aid. In 1998 the children were deemed to be children in need of aid pursuant to former AS 47.10.010(a)(1)(A)[2] and committed to the custody of DFYS for a period of two years.

In 1999 Richard was charged with sexual assault of a minor (SAM) in the second degree for sexual contact with his daughter, Cynthia. That charge was later reduced to attempted SAM in the second degree, to which Richard pled no contest in 2000. Richard received a sentence of five years, with two years suspended. At the change of plea, Richard was represented by Brian Kay of the Bethel office of the Public Defender Agency.

In May 2000 the state petitioned for a termination of Richard and Leslie's parental rights. Richard was represented by the Public Defender Agency. Leslie was represented by the Office of Public Advocacy (OPA). In July 2000 the OPA contract was transferred to the Henderson & Kay Law Office, who then filed an entry of appearance as counsel for Leslie. Brian Kay was a member of that firm.

The facts concerning each issue are straightforward. With regard to the conflict issue, Kay appeared on behalf of Leslie at a

---

1. Pseudonyms have been used for all family members throughout this opinion.

2. This section has since been recodified at AS 47.10.011.

calendar call in August 2000 and stated that he had previously handled Richard's criminal case and that his partner, David Henderson was also involved in "this." Kay acknowledged that there was a conflict and stated that he would check with Henderson and let the court know the status of any potential conflict within two weeks. At the September calendar call, at which Henderson appeared on Leslie's behalf, no mention was made of any conflict in Henderson & Kay's representation. At the pretrial conference in October, the court indicated that it believed the situation could be remedied by the implementation of an ethical wall, as Henderson had no knowledge of Richard's criminal matter and had not spoken with Kay about it. According to the court, the ethical wall would consist of a formal arrangement recognizing that Henderson and Kay would have no communication concerning the two cases, and that Henderson would receive no information from any firm file about Richard. The court noted that if any party wanted to address the issue before trial began a week later, the party should notify the court and the matter would be put on the calendar.

With regard to his request to participate in the trial in person, Richard moved on September 28, 2000 for an order of transport from the correctional facility in Seward to the one in Bethel for the duration of the termination trial, scheduled to begin on Octo-

ber 16. He asked to be transported no later than October 4, so he would have time to help his attorney prepare for trial. Richard's motion was unopposed by DFYS, but was objected to by the Department of Corrections (DOC). After hearing argument on the motion at the pretrial conference, the trial court issued an order denying Richard's motion for transport, citing AS 33.30.081(f)[3] and AS 33.30.061(a)[4] and stating that "[t]he court has historically held termination trials with some of the parties telephonically and they have been completed successfully."

On the first day of trial, Richard renewed his motion for transport to Bethel for trial and reiterated his opposition to Henderson & Kay's representation of Leslie. The court again denied Richard's motion for transport. The court also denied Richard's motion regarding the conflict, again finding that an ethical wall would be sufficient to prevent any information learned during Kay's representation of Richard from prejudicing Richard at trial.

After five days of trial, during which Richard testified by telephone, the court found that the state had proven, by clear and convincing evidence, that the children were children in need of aid pursuant to five of the six bases alleged by the state under AS 47.10.011.[5] The court further found that the

3. AS 33.30.081(f) provides:
A court may order a prisoner who is a party ... to a civil action ... to appear at a place other than within a correctional facility only if the court determines, after providing a reasonable opportunity for the commissioner to comment, that the prisoner's personal appearance is essential to the just disposition of the action. In making its determination, the court shall consider available alternatives to the prisoner's personal appearance including deposition and telephone testimony.

4. AS 33.30.061(a) provides:
The commissioner shall designate the correctional facility to which a prisoner is to be committed to serve a term of imprisonment or period of temporary commitment. The commissioner may designate a facility without regard to whether it is maintained by the state, is located within the judicial district in which the prisoner was convicted, or is located in the state.

5. The first requirement for the termination of parental rights is that a child be found by clear

and convincing evidence to be in need of aid under AS 47.10.011. *See* AS 47.10.088(a)(1)(A). DFYS alleged that Richard's children had been subjected to the following conduct as described by AS 47.10.011:
(1) a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid under this chapter;
. . . .
(6) the child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent, guardian, or custodian or by the failure of the parent, guardian, or custodian to supervise the child adequately;
(7) the child has suffered sexual abuse, or there is a substantial risk that the child will suffer sexual abuse, as a result of conduct by or conditions created by the child's parent, guardian, or custodian or by the failure of the parent, guardian, or custodian to adequately supervise the child . . .;

conduct causing the children to be in need of aid had not been remedied,[6] that Richard was incarcerated and the requirements of AS 47.10.080(*o*) had been met,[7] that the state had made active efforts to provide rehabilitative services to prevent the family's breakup,[8] and that maintaining parental rights would result in serious emotional and physical harm to the children.[9] Superior Court Judge Dale O. Curda then granted DFYS's petition to terminate the parental rights of Richard and Leslie.

Richard appeals, claiming that the trial court erred in permitting Henderson & Kay to represent Leslie over his objection and that the court both abused its discretion and violated his due process rights in denying his motion for transport to trial.

## III. STANDARD OF REVIEW

 "A trial court's decision to disqualify counsel will only be reversed if it constitutes an abuse of discretion." [10] A trial court abuses its discretion when "we are left with a

definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling." [11]

 We review decisions regarding the telephonic appearance of a party for abuse of discretion.[12] However, we will review *de novo* whether the decision to require an imprisoned parent to testify telephonically rather than transporting him to a termination trial violates his right to due process.[13] On that question, we will adopt the rule most persuasive in light of precedent, reason, and policy.[14]

## IV. DISCUSSION

### A. The Trial Court Abused Its Discretion in Allowing Henderson & Kay To Represent Leslie Over Richard's Objection.

 Richard argues that his legal representation at the termination trial was marred by an actual conflict of interest. Under Alaska Rules of Professional Conduct 1.9 [15] and

---

(8) conduct by or conditions created by the parent, guardian, or custodian have
 (A) resulted in mental injury to the child; or
 (B) placed the child at substantial risk of mental injury . . .;
(9) conduct by or conditions created by the parent, guardian, or custodian have subjected the child or another child in the same household to neglect;
(10) the parent, guardian, or custodian's ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child[.]

The superior court found that each of these subsections, except subsection (1), had been proven by clear and convincing evidence.

6. AS 47.10.088(a)(1)(B); Alaska Child in Need of Aid Rule 18(c)(1)(A).

7. This section provides an alternative basis for the termination of parental rights. AS 47.10.088(a); CINA Rule 18(c)(1)(B). Under AS 47.10.080(*o*), where there is clear and convincing evidence that a parent will be incarcerated for a significant part of the child's life, there is not another parent available to care for the child, and "the incarcerated parent has failed to make adequate provisions for care of the child during the period of incarceration that will be during

the child's minority," parental rights can be terminated.

8. 25 U.S.C. § 1912(d) (2003); *see also* CINA Rule 18(c)(2)(B).

9. 25 U.S.C. § 1912(f) (2003); *see also* CINA Rule 18(2)(C)(3).

10. *Cannon v. Stonefield (In re Estate of McCoy)*, 844 P.2d 1131, 1135–36 (Alaska 1993).

11. *Peter Pan Seafoods, Inc. v. Stepanoff*, 650 P.2d 375, 378–79 (Alaska 1982).

12. *Midgett v. Cook Inlet Pre-Trial Facility*, 53 P.3d 1105, 1109 (Alaska 2002).

13. *Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles*, 20 P.3d 1130, 1134 (Alaska 2001).

14. *Id.* at 1134 n. 6 (*citing Barcott v. State, Dep't of Pub. Safety*, 741 P.2d 226, 228 (Alaska 1987)).

15. In relevant part, Alaska R. Prof. Conduct 1.9 provides:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the

1.10,[16] Richard argues that Henderson & Kay should have been disqualified from representing Leslie, since the subject matters of the criminal case and termination proceeding were substantially related, Henderson & Kay took a position materially adverse to Richard in the termination proceedings, and the ethical wall put in place by the court did not cure the conflict. To remedy this abuse of discretion, Richard asserts that the termination order must be reversed and a new trial be granted.

Richard essentially argues that because Kay had an actual conflict under Rule 1.9 and personally could not have represented Leslie in the termination, all members of the firm of Henderson & Kay had an imputed conflict under Rule 1.10. Therefore, Richard reasons, Henderson should have been precluded from representing Leslie in the termination proceedings on the basis of his imputed conflict.

### 1. Kay had an actual conflict.

A lawyer's duty to former clients is codified in Alaska Rule of Professional Conduct 1.9(a). Where the previous representation and current litigation cover the same or substantially related matters and the current client's interests are materially adverse to those of the former client, the lawyer shall not represent the current client unless the former client consents.[17]

#### a. The cases are substantially related.

Richard argues that the subject matter underlying his attempted SAM conviction and the termination proceeding are substantially related to one another. As Richard reasons, Kay represented Richard at the change of plea and sentencing in the attempted SAM prosecution. Subsequently,

the alleged conduct underlying his conviction was used as a central allegation in the petition to terminate his parental rights. Directing us to *Daniels v. State*[18] and *Aleut Corp. v. McGarvey*,[19] Richard concludes that, under any possible test, the issues in these two cases were substantially related.

The state argues that the CINA case and the criminal case were not substantially related because the elements the state was required to prove in the criminal and CINA cases were different. The state characterizes Cynthia's sexual abuse as being a minor factor in the termination proceeding and disagrees with Richard's claim that *Daniels* and *Aleut Corp.* establish a standard for determining when two issues are substantially related.

■ During the pretrial proceedings, however, the state conceded that the two matters were related. At the pretrial conference, the state asserted:

> The crux of the matter is what was the subject matter.... [T]he subject matter is directly related to this case. [Richard] in that case sexually assaulted his daughter, and his rights as a father are being implicated here, so I don't think the fact that sentencing took place in February or maybe it was March is relevant, really. And I also don't think it's particularly relevant that it was the result of a plea bargain. I'd say the majority of cases resolve in plea bargain, but that doesn't mean there aren't substantive negotiations and thought processes that go into that.

Where a party concedes a fact at trial, that fact cannot later be contested on appeal.[20] Though the parties were not yet at trial when the state made its concession, the matter had to be decided before trial since it involved trial counsel. The state's concession

---

former client unless the former client consents after consultation.

**16.** In relevant part, Alaska R. Prof. Conduct 1.10 provides:
(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2.

**17.** Alaska R. Prof. Conduct 1.9(a).

**18.** 17 P.3d 75 (Alaska App.2001).

**19.** 573 P.2d 473, 475 (Alaska 1978).

**20.** *Toney v. City of Anchorage Police Dep't,* 950 P.2d 123, 126 (Alaska 1997) (stating that, once party concedes fact at trial, party may not later contest it). *See also Wettanen v. Cowper,* 749 P.2d 362, 364 (Alaska 1988) (holding that, absent plain error, point implicitly conceded at trial cannot be raised on appeal).

at the conference, therefore, bars its contention of this point on appeal.

 Even if this argument was not waived at trial, we find that the matters are substantially related. In *Aleut Corp.*, we held that an attorney may not represent a third party against a former client where there exists a substantial possibility that knowledge gained by him in the earlier professional relationship can be used against the former client, or where the subject matter of his present undertaking has a substantial relationship to that of his prior representation.[21]

In its petition to terminate parental rights, DFYS contended that Richard had not remedied his conduct or the conditions in his home since the children were first adjudicated to be in need of aid and that, as a result of his behavior, he had been sentenced to three years in prison for the sexual abuse of his daughter. Further, in its pretrial memorandum, the state referred to Richard's SAM conviction and concluded that "the cycle has not been broken, the issues that brought the children into state custody persist." DFYS also alleged that the treatment and counseling offered to Richard had not had any effect.

In its decision, the trial court found that "based upon his no contest plea in 4BE–S99–752 CR for Attempted Sexual Abuse of a Minor in the 2nd Degree, clear and convincing evidence exists that [Richard], at the least, placed [Cynthia] at the risk of sexual abuse." The court went on to say that, "[n]onetheless, and notwithstanding the above," both Richard and Leslie placed the children at substantial risk of sexual assault. This paragraph indicates that, although there was other evidence supporting termination under other subsections of AS 47.10.011, Richard's attempted SAM conviction clearly exerted some influence over the court's decision to terminate Richard's parental rights. While the trial court found reasons other than the sexual abuse supporting termination, that result could not have been known to the court at the time it decided the conflict of interest issue.

Brian Kay represented Richard in his sexual assault case. The conviction resulting from Richard's no contest plea in that case played a role in the termination of his parental rights. As such, we find that Kay's prior representation was substantially related to the termination proceeding.

#### b. Leslie's interests are materially adverse to Richard's.

 Richard next argues that his interests were materially adverse to Leslie's in the termination proceedings. On appeal, the state claims that Richard and Leslie's positions were aligned, as neither wanted the state to terminate their parental rights. Further, the state now maintains that it would not advance Leslie's case to show that Richard was an abusive father because under AS 47.10.011 the state could terminate Leslie's parental rights based on Richard's conduct alone.

This argument stands in direct contrast to DFYS's position at trial. As discussed earlier, at the pretrial conference, the state declared that "it's clear that Mr. Kay would have a conflict to continued representation of [Leslie], when he represented Richard at the criminal matter" as Richard and Leslie "obviously ... have separate interests. [Leslie] wants her child back, [Richard] wants his child back, he's in jail, they're separated, they don't, you know, have much contact together.... [T]hat's a clear conflict." Again, where a party concedes a fact at trial, that fact can not be challenged on appeal.[22]

 Even if the state had not conceded at trial that there was a conflict, we find its current argument to be without merit and its reliance on AS 47.10.011 to be misplaced. First, AS 47.10.011 governs an initial finding that a child is in need of aid. Alaska Statute 47.10.088 governs termination and, while section .011 is incorporated into section .088, more than a finding that a child is in need of aid is required to terminate parental rights. Given this statutory scheme, the state is simply inferring too much from the language of section .011. While certain subsections of

---

**21.** 573 P.2d at 474–75.

**22.** *See* authorities cited *supra* note 20.

AS 47.10.011 implicate the conduct of both parents, once a child has been found to be in need of aid, the state must then prove that the parent whose rights the state wishes to terminate has failed to remedy the conduct underlying the petition and that returning the child to the home would place the child at a substantial risk of physical or mental injury.[23] Contrary to the state's argument, none of these findings could be made against Leslie based on Richard's conduct alone.

We conclude that Richard and Leslie's positions were materially adverse. At the time of termination, Leslie had married another man. Leslie testified that she didn't want Richard to have contact with the children because Richard had abused Leslie and sexually assaulted Cynthia. Leslie also testified that she didn't want Richard to have any contact with the children because Richard hit his children and masturbated in front of Cynthia and touched her inappropriately. In her closing argument, Leslie argued for the termination of Richard's rights "based on the sexual abuse."

Richard, on the other hand, testified that he had never touched Cynthia in a sexual manner. He stated that he was confused when he entered his plea of no contest to the attempted SAM charge. Though he was represented by counsel at those proceedings, Richard testified that he didn't understand what he was pleading to. As Richard maintained that he had not sexually assaulted Cynthia, while Leslie argued that the sexual assault was the main reason in support of the termination of Richard's parental rights, Leslie's interests were materially adverse to Richard's.

### 2. Kay's conflict was imputed to Henderson.

Richard contends that, according to Alaska Professional Conduct Rule 1.10, where one attorney in a law firm would be disqualified from representing a client, the entire firm is disqualified. Thus, he concludes that because Kay was disqualified, Kay's partner, Henderson, should be disqualified as well. In contrast, the state, analyzing the situation under Rule 1.9(b), Rule 1.10, and the accompanying commentaries, argues that because Henderson himself did not have a conflict, he should not be precluded from representing Leslie.

### a. The state's Rule 1.9(b) argument

Rule 1.9(b) governs representation of a person by an attorney whose former firm had previously represented a client with interests materially adverse to that person and about whom the lawyer had acquired confidential information.[24] Rule 1.10(a) bars a firm's representation of a client when any member of the firm would be prohibited from representing that client under Rules 1.7, 1.8(c), 1.9, or 2.2.[25] While the commentary to Rule 1.9(b) mentions "vicarious disqualification" (another term for imputed disqualification), the text of Rule 1.9(b) indicates that this commentary is discussing a different form of imputed disqualification than the one at issue here.

The state argues that the commentary "rejects any rigid per se approach to disqualification in favor of a two pronged 'functional analysis' which looks at whether (i) confidences are preserved and (ii) adverse positions to the client are avoided." Maintaining that Richard and Leslie did not have legally adverse positions and that confidences were preserved under Rule 1.9(c), the state concludes that there was no reason for Henderson to have been disqualified from representing Leslie.

---

**23.** AS 47.10.088.

**24.** Alaska R. Prof. Conduct 1.9(b) states:

A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

(1) whose interests are materially adverse to that person; and

(2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client consents after consultation.

**25.** Alaska R. Prof. Conduct 1.10(a) states:

While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2.

This "two-pronged functional analysis," however, does not impact our analysis under Rule 1.10(a). Once a lawyer is deemed to have a conflict under Rule 1.9, that lawyer is disqualified from representing another client with an adverse position in a substantially related matter unless the previous client consents. In situations where it is not immediately clear that an attorney has a conflict with a client of a prior firm, the functional analysis should be undertaken to determine if the attorney has acquired confidential information relevant to a substantially related matter on which the attorney would be asked to take a position adverse to that former client. Where an individual attorney is conflicted out under either of these scenarios, that conflict is imputed to the attorney's entire firm under Rule 1.10(a). Thus the "functional analysis" described in the comment to Rule 1.9 applies only to determine whether there is a conflict in the first place and not to ascertain whether the conflict should be imputed to other members of the conflicted attorney's firm. As the comment to Rule 1.10 explains, "each lawyer is vicariously bound by the obligation of loyalty [owed] by each lawyer with whom the lawyer is associated." [26]

### b. This conflict was imputed under Rule 1.10.

 Richard argues that the purpose behind vicarious disqualification is to protect the former client's confidences where a member of a law firm had acquired knowledge material to current litigation. As Kay had an actual conflict of interest, Richard contends, Henderson's statement to the court that his firm did not have a conflict of interest because he had no knowledge of Richard's criminal matter was "simply a wrong legal analysis of [Alaska Rules of Professional Conduct] 1.9 and 1.10." The state responds by asserting that since Kay no longer had access to Richard's criminal file and there was no evidence that Henderson and Kay had shared any confidences regarding Richard, there was no reason to impute to

Henderson any conflict Kay might be found to have.

The commentary to Rule 1.10 states that the rule of imputed disqualification found in Rule 1.10(a) gives effect to the principle of loyalty to the client. As the comment explains:

> Such situations can be considered from the premise that a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client, or from the premise that each lawyer is vicariously bound by the obligation of loyalty [owed] by each lawyer with whom the lawyer is associated. [27]

Thus, as a plain reading of Rule 1.10(a) indicates, because Kay had a conflict in representing Leslie, that conflict must be imputed to Henderson, thereby barring either of them from representing Leslie at the CINA hearing.

### 3. The trial court erred in refusing to disqualify Henderson & Kay from representing Leslie during the termination proceeding.

#### a. Richard's motion to disqualify was not untimely.

 The state argues that Richard's motion to disqualify Henderson from representing Leslie was untimely and that Richard's delay resulted in a waiver of any conflict. The state alleges a two-month delay from the time Richard was made aware of the potential conflict to the time he raised the issue in court. At a minimum, the state contends, Richard's delay contributed to the factors that weighed against disqualification of Henderson & Kay.

Richard argues that Kay's notice at the calendar call that he had a conflict did not constitute a waiver of his right to object to the firm's conflict. Richard further maintains that there was no opportunity to discuss the conflict with his attorney prior to the pretrial conference and that any delay was not designed to gain tactical advantage.

---

**26.** Alaska R. Prof. Conduct 1.10, cmt. at 899 (2003).

**27.** *Id.*

The state cites *Jackson v. J.C. Penney Co.*[28] for the proposition that failure to make a reasonably prompt motion for disqualification may result in the conflict being waived, as considerations of the right to choice of counsel, expense, and delay support a requirement that motions to disqualify be brought promptly. Courts in other jurisdictions have also held that motions to disqualify counsel should be made with reasonable promptness after the potential conflict is known.[29] Other courts, however, have held that, absent a showing of improper motive, delay should not be considered in deciding motions to disqualify.[30]

There is no evidence in the record that Richard waited until the pretrial conference to object to Henderson & Kay's representation of Leslie to gain a tactical advantage or to harass either Leslie or the state. Rather, the record indicates that the pretrial conference was the first time Richard had personally heard of the potential conflict. The delay was two months, much shorter than the periods allowed in other cases.[31] Furthermore, at the calendar call, Kay indicated that he would advise the court of the status of any potential conflict his firm had within a couple of weeks. It appears as though no such advice was ever received by the court or counsel. Given the lack of evidence indicating an improper motive and the importance of having counsel free from conflicts of inter-

est, the two-month delay in bringing the motion to disqualify did not result in the waiver of Richard's right to challenge the conflict.

### b. The court did not properly institute screening measures.

Richard argues that no screening procedure was implemented to allow Henderson to represent Leslie at the termination proceeding, asserting that no ethical wall saved the firm from an actual conflict of interest. The state, though, argues that an ethical wall did prevent any potential prejudice to Richard. The state also argues that proper screening mechanisms mitigate the need to disqualify, especially where there has been a delay in moving for disqualification.

We have never before addressed the question of whether screening measures can allow a firm to represent a client that the firm would otherwise be prohibited from representing under Rule 1.10. While the Alaska Comment to Professional Conduct Rule 1.11 states that courts have recognized screening methods that prevent intrafirm exchange of confidential information,[32] we decline to import this comment into Rule 1.10.

Rule 1.11 relates to successive government and private employment. While the text of Rule 1.11(a)[33] might be interpreted to in-

**28.** 521 F.Supp. 1032 (N.D.Ga.1981).

**29.** *See, e.g., Central Milk Producers Coop. v. Sentry Food Stores, Inc.,* 573 F.2d 988, 992 (8th Cir.1978); *Redd v. Shell Oil Co.,* 518 F.2d 311, 316 (10th Cir.1975) (stating that "lawyer conflict of interest problems ought to be brought up long before the date of trial in an atmosphere which does not cast a shadow over the trial itself"); *First Small Bus. Inv. Co. of California v. Intercapital Corp. of Oregon,* 108 Wash.2d 324, 738 P.2d 263, 270 (1987) (holding that failure to file motion for disqualification until several years after the existence of basis for potential disqualification was known justified denial of motion).

**30.** *See, e.g., Kevlik v. Goldstein,* 724 F.2d 844, 848 (1st Cir.1984) (holding that, where record showed no tangible evidence of improper motive, court could not, "in the face of a breach of a professional duty, ignore the wrong because appellees' counsel neglected to discern the conflict earlier, or even opted to delay litigation by raising the motion near the commencement of tri-

al"); *Emle Indus., Inc. v. Patentex, Inc.,* 478 F.2d 562, 574 (2d Cir.1973) (holding that in extreme cases delay may be factor in motions to disqualify but that three-year delay here was not excessive and that, as disqualification was in public interest, court could not act contrary to that interest by permitting party's delay in filing motion to disqualify to justify continuance of breach of Code of Professional Responsibility).

**31.** *See Kevlik,* 724 F.2d at 848 (three years); *Emle,* 478 F.2d at 574 (three years).

**32.** Alaska R. Prof. Conduct 1.11, cmt. at 900 (2003).

**33.** Alaska R. Prof. Conduct 1.11(a) provides:

Except as law may otherwise expressly permit, a lawyer shall not represent a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency consents after con-

clude the public defender, as public defenders are public employees, the comments to Rules 1.10 and 1.11 indicate that the government employment envisioned by the drafters did not include public defenders. The reason for this distinction is explained in the commentary. Rule 1.11 "prevents a lawyer from exploiting public office for the advantage of a private client." [34] The comments to both Rule 1.10 and Rule 1.11 discuss Rule 1.11's application to a lawyer who had previously represented the government.[35] Unlike most public lawyers, public defenders do not represent the government or a public agency. Rather, they represent individual clients. Instead of working on behalf of the state, public defenders work on behalf of private individuals whose interests are often directly contrary to the interests of the state or society at large, despite the fact that public defenders receive their compensation from the state.[36]

Given our conclusion that Rule 1.11 does not apply to the case of a public defender who has joined a private firm, we must determine whether to import the screening provisions of Rule 1.11 into Rule 1.10. The comment to Rule 1.10 specifically addresses the varying consequences of disqualification. As the comment states, "[d]ifferent provisions are ... made for movement of a lawyer from one private firm to another and for movement of a lawyer between a private firm and the government." [37] The drafters could have written Rule 1.10 to allow the implementation of screening measures where a conflict of interest exists. Instead, they chose to draft a separate rule endorsing screening procedures only for attorneys transitioning between government and private practice. Accordingly, we decline to import the provisions of Rule 1.11 into Rule 1.10 and conclude that the screening measures found in Rule 1.11 do not apply to a Rule 1.10 conflict.[38]

sultation. No lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter unless:

(1) the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom; and

(2) written notice is promptly given to the appropriate government agency to enable it to ascertain compliance with the provisions of this rule.

**34.** Alaska R. Prof. Conduct 1.11, cmt. at 900 (2003).

**35.** Alaska R. Prof. Conduct 1.10, cmt. at 899; Alaska R. Prof. Conduct 1.11, cmt. at 900 (2003).

**36.** This reading is further bolstered by the fact that Rule 1.11 requires the state agency to give permission to the potentially-conflicted representation. The Public Defender Agency could not give an attorney permission to represent an adverse interest if that attorney's prior client objected to the representation.

**37.** Alaska R. Prof. Conduct 1.10, cmt. at 899 (2003).

**38.** *Cf. Aleut Corp. v. McGarvey,* 573 P.2d 473 (Alaska 1978) (construing prior ethical rules to state that "where one member of a firm is disqualified from representing a client all are"). *See also Adams v. Aerojet–General Corp.,* 86 Cal. App.4th 1324, 104 Cal.Rptr.2d 116, 122 (2001) ("It is now firmly established that where the

attorney is disqualified from representation due to an ethical conflict, the disqualification extends to the entire firm" due to the "practicable impossibility" of creating ethical walls where the attorney has gained confidential information.); *State v. Hunsaker,* 74 Wash.App. 38, 873 P.2d 540, 542 (1994) ("If an individual in a law firm is precluded by RPC 1.9 from representing a particular client, then all members of the law firm are likewise prohibited from representing the client under RPC 1.10."); *Edward J. DeBartolo Corp. v. Petrin,* 516 So.2d 6, 7 (Fla.App.1987) (holding that differences between rules for government and private attorneys were intentional and that no screening procedures cure conflict where movement is between private firms); *Weglarz v. Bruck,* 128 Ill.App.3d 1, 83 Ill.Dec. 266, 470 N.E.2d 21, 24 (1984) (determining ethical wall to be appropriate only where attorney could clearly and effectively demonstrate that he had no knowledge of the confidences and secrets of former client). *But see Petrovich v. Petrovich,* 556 So.2d 281, 282 (La.App.1990) (holding that firm could represent husband in divorce where member of firm had one-time limited scope meeting with wife prior to joining firm and cone of silence was instituted); *Ussury v. St. Joseph Hosp.,* 43 Ohio App.3d 48, 539 N.E.2d 700, 701 (1988) (recognizing by implication that screening may be effective in preventing member's disqualification from being extended to entire firm); *Jenson v. Touche Ross & Co.,* 335 N.W.2d 720, 732 (Minn.1983) (holding that representation of adverse party by attorney of-counsel with firm on substantially related matter did not prevent 80–member firm from representing client with insti-

### c. Richard did not fail to request reconsideration.

Finally, the state argues that Richard failed to request reconsideration and therefore waived any further consideration of this matter. At the pretrial conference, Judge Curda, after stating that Henderson would not be disqualified and that an ethical wall would prevent the sharing of confidences, told the parties that if any of them felt the issue needed to be readdressed later that week, that party could notify his office. Although no papers were filed with the court requesting reconsideration, Richard asked for reconsideration prior to the start of trial. The court realized that Richard's statement challenging the propriety of Henderson's representation of Leslie was a motion for reconsideration, stating that it was "going to deny reconsideration ...; going to deny the motion." While Richard did not file a written motion requesting reconsideration, the court recognized his oral request as a request for reconsideration; Richard therefore did not fail to ask for reconsideration.

### 4. On remand, the trial court must determine if Richard was adversely affected by Henderson's representation of Leslie.

Richard argues that the superior court's refusal to dismiss Henderson from Leslie's representation requires reversal of the court's order terminating his parental rights. The state, however, maintains that Richard did not suffer any harm, as the state only needed to prove that the children were in need of aid under one jurisdictional basis and evidence of Richard's conviction for sexual abuse of a minor would have come in as evidence in any event because it was a matter of record. We have not yet addressed the proper remedy for a failure to disqualify counsel because of a conflict of interest in a termination of parental rights proceeding.

We begin with the propositions that the right to parent is a fundamental right,[39] and that appointed counsel is guaranteed for indigent parents when their parental rights are at stake.[40] Accordingly, a parent who faces termination of parental rights is entitled to an attorney who is free of any conflict. But this case does not present that problem: Richard was throughout the termination case represented by an independent, conflict-free attorney.

Richard's argument relies upon the *quasi per se* rule of reversal adopted in *LaPierre v. State* and other cases from criminal law in which defendants allege a conflict of interest.[41] But those cases involve criminal defendants who had been represented by attorneys with conflicted interests. In that situation, the conflict obviously threatens to deprive the defendant of the constitutional right to effective assistance of counsel; the rule of almost automatic reversal simply recognizes that this constitutional right has been traditionally deemed nearly absolute. *LaPierre's* harmless error test, then, is uniquely tailored to the fundamental nature of the constitutional right it protects: the defendant's right to effective assistance of counsel in the proceeding at issue.

In the case at issue here, by contrast, Richard was not represented by the conflicted attorney; rather, his former attorney in an earlier matter improperly represented *another* party—Richard's codefendant, Leslie—in the present action. In this situation, there is no reason to believe that the disputed conflict of interest deprived Richard of his right to effective assistance of counsel in the present case. Although Henderson & Kay's conflict undeniably exposed Richard to a risk of prejudice by potentially enabling the firm to use previously gained confidences unfairly against Richard, this form of prejudice has little bearing on the interests protected by Richard's constitutional right to counsel: his right to effective representation in the pres-

---

tution of ethical wall shielding of-counsel member).

**39.** *J.M.R. v. S.T.R.*, 15 P.3d 253, 257 (Alaska 2001) (holding that right to care and custody of one's own child is fundamental right recognized by both federal and state constitutions).

**40.** *V.F. v. State*, 666 P.2d 42, 44–45 (Alaska 1983).

**41.** *See, e.g., LaPierre v. State*, 734 P.2d 997 (Alaska App.1987). *LaPierre* relied on *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

ent case by his own attorney. Throughout these termination proceedings, Richard received the services of a nonconflicted attorney whose loyalty and competence remain unchallenged.

To be sure, improprieties directed against a defendant by a codefendant's attorney can cause serious prejudice and, in that sense, can hamper the defendant's attorney's ability to present a successful defense. But error of that kind is no different than any other error emanating from sources beyond the defense counsel's control. Because such errors do not derive from or reflect any shortcoming in the quality of the defendant's legal representation in the case at issue, they cannot fairly be said to infringe the defendant's constitutional guarantee of effective assistance of counsel. Richard offers no authority to the contrary. The only case he cites involving a codefendant's improper representation by an attorney who formerly represented the defendant, *State v. Sanders*,[42] is readily distinguishable: because the conflicted attorney in *Sanders* initially represented the defendant in the same case, the conflict at issue there directly implicated the defendant's right to counsel in that case.

We therefore see no reason to assume that Richard suffered the same kind of fundamental, constitutionally subversive harm that *LaPierre* and *Cuyler* presume will occur when a defendant's own counsel actively serves interests adverse to the defendant's.

Moreover, Richard suggests no other sound reasons to apply a harmless error test like *LaPierre's*, which builds in a presumption of prejudice. Although he cursorily asserts that a presumption of prejudice is necessary because the prejudicial effects of conflicted representation may be difficult to prove, Richard fails to explain why this is so. The assertion that prejudice is difficult to prove may have considerable merit when a defendant is represented by a conflicted attorney, and perhaps even when a codefendant is improperly represented by an at-

torney who formerly represented the defendant in the same case.[43] But the inherent difficulty of proving prejudice does not seem self-evident when the conflict arises from former representation in a different proceeding. Assisted by current counsel, the defendant would presumably be able to recall or discover most previously revealed confidences and would be capable of identifying and guarding against their possible exploitation by defendant's former counsel. Hence, it would not seem unreasonable to require some showing of actual prejudice as a prerequisite to reversal.

Nor would any deterrent purpose be served in this case by replacing the conventional harmless error test, which demands a showing of actual prejudice, with a rule that presumes prejudice. To the contrary, in the present case a reversal based on presumed prejudice would have perverse consequences: it would have no direct impact on the offending attorneys or their client; yet it would severely penalize the state and, consequently, the three children whose interests the state represents—even though the state actively sought to disqualify Kay at the superior court level.

This is not to say that a conflict like this could never have constitutional ramifications. But if the ethical breach in this case raises constitutional concerns, they center on notions of fairness—procedural due process.[44] We can imagine circumstances in which representation of a codefendant by the defendant's former counsel might generate a risk of unfair prejudice so grave as to violate the defendant's right to due process. But beyond showing the bare existence of a conflict here, Richard points out no specific circumstances suggesting fundamental unfairness. Nor are any such circumstances readily apparent. Given the numerous allegations underlying the state's termination petition and the strength of its evidence, Richard's prior sexual abuse prosecution—the case in which

---

42. 260 N.J.Super. 491, 616 A.2d 1345 (1992).

43. *See, e.g., Sanders,* 616 A.2d at 1349–50.

44. Richard does not specifically contend that Henderson & Kay's ethical breach violated his

constitutional right to due process and, apart from suggesting a violation of the right to counsel, does not identify any other potential constitutional violation.

he was represented by Kay—was not essential to the superior court's decision. Richard's conviction in that case was a matter of public record. Given that any attorney representing Leslie, conflicted or not, would be free to exploit this information, it seems difficult to fathom what confidences Richard might have revealed in the prior proceeding that could have caused him any significant incremental damage.

And finally, it seems relevant to consider that Kay personally played only a minor role in the termination case, representing Leslie in the case's earliest stages and then handing it off to Henderson. Once Kay stepped out of the picture, his firm made diligent efforts to screen him from Henderson. Although as an ethical matter these screening measures did not meet Rule 1.9's stringent requirements or authorize Henderson & Kay to represent Leslie, they did, as a practical matter, eliminate much of the risk of actual prejudice to Richard. They thus cut strongly against a finding of fundamental unfairness. Absent a more particularized showing of actual prejudice, then, we see no basis for concluding that the circumstances of this case implicate Richard's constitutional right to due process. It follows that the error in allowing conflicted representation is a nonconstitutional error.

For these reasons, we conclude that our conventional test for non-constitutional error must be used to determine if Henderson & Kay's ethical breach amounted to reversible error.[45] On remand, the superior court must determine if there is a realistic likelihood that Henderson & Kay's conflicting interest had any appreciable effect on the outcome of the termination proceedings.

**B. The Superior Court Did Not Abuse Its Discretion in Denying Richard's Request To Attend the Parental Rights Termination Trial.**

▇▇▇ Richard next argues that the superior court abused its discretion in denying his motion for transport to Bethel to prepare for and attend the termination trial. The state contends that the court properly considered the facts, law, and its past experiences with telephonic participation in termination proceedings before denying the motion.

As the superior court noted in its order denying transport, AS 33.30.081(f) governs the transportation of prisoners to civil trials to which they are a party. This statute provides:

> A court may order a prisoner who is a party . . . to a civil action . . . to appear at a place other than within a correctional facility only if the court determines, after providing a reasonable opportunity for the commissioner to comment, that *the prisoner's personal appearance is essential to the just disposition of the action.* In making its determination, the court shall consider available alternatives to the prisoner's personal appearance including deposition and telephone testimony.[46]

Relying on this statute, the court stated that it "has historically held termination trials with some of the parties telephonically and they have been completed successfully." Following the initial denial of Richard's motion for transport, his attorney asked the court to reconsider its decision, arguing that:

> without [Richard] here being able to confront those persons who are witnesses against him in this proceeding, a proceeding which is tantamount to a criminal proceeding in that it's going to discuss issues such as sexual abuse alleged to have occurred or [been] perpetrated by [Richard], as well as this is a termination of his parental rights for his children, and so it is essential that he's here, and despite financial burdens that the state might incur, and I would also add that telephone call certainly is a substantial financial burden in itself that we're incurring, but I would ask that the court reconsider and have him transported to the court—order that the

---

45. *Love v. State,* 457 P.2d 622, 634 (Alaska 1969) ("[W]e have selected a simple statement to summarize our own approach to harmless error: whether we can fairly say that the error did not appreciably affect the jury's verdict.").

46. AS 33.30.081(f) (emphasis added).

commissioner transport him to the courthouse as soon as possible.

The superior court again declined to exercise its discretion under subsection .081(f), relying on the facts that it has historically held termination hearings telephonically and that in *E.J.S. v. Department of Health & Social Services*,[47] we held that the due process rights of a father to confront and cross-examine witnesses in a termination proceeding were not violated by his telephonic participation because his attorney was physically present in the courtroom.[48]

Richard maintains that "[t]he trial court abused its discretion when it failed to weigh [Richard's] need to timely consult with counsel and to personally testify, against the state's expense in transporting him to Bethel for the trial." However, the state counters that as directed by the statute, the court considered whether it was necessary to the outcome of the trial that Richard be present and accurately gauged that telephonic testimony offered a viable alternative to transporting Richard to Bethel for trial. According to the state, on appeal Richard has failed to demonstrate specifically how his failure to be present adversely affected the outcome of the trial. The state concludes that "[a]lthough [Richard] states the trial court was unable to assess his credibility, he does not contend that the court found him less than credible or state how his credibility materially affected the outcome of the trial."

 In considering circumstances under which trial courts should grant prisoners' requests to be transported to court to testify in person, appellate courts in several states have agreed upon a set of factors a trial court should balance in making such a deter-

mination. As summarized by the Supreme Court of North Dakota:

In making its determination the trial court may take into account the costs and inconvenience of transporting a prisoner from his place of incarceration to the courtroom, any potential danger or security risk which the presence of a particular inmate would pose to the court, the substantiality of the matter at issue, the need for an early determination of the matter, the possibility of delaying trial until the prisoner is released, the probability of success on the merits, the integrity of the correctional system, and the interests of the inmate in presenting his testimony in person rather than by deposition.[49]

We agree that these factors are among those a trial court should consider in deciding whether to grant an incarcerated parent's request to be transported to a termination trial. Alaska Statute 33.30.081(f) vests significant discretion in the trial court to make this determination. As with any discretionary decision, trial courts must carefully weigh all relevant factors in assessing whether the presence of an incarcerated parent is "essential to the just disposition of the action." [50]

In this case, we recognize that a fundamental right was at stake, that multiple issues were involved and the proceedings were lengthy, and that Richard preferred to be present for the trial and to give his testimony in-person. We also recognize that where the credibility of a party or witness will likely affect the outcome of the case, it will be important for the court to see and hear the person testify. As we recently explained,

the potential for empathy and nuanced understanding is much greater in person-to-person communications than in any of the

---

**47.** 754 P.2d 749 (Alaska 1988).

**48.** *Id.* at 752.

**49.** *B.H. v. W.S. (In re F.H.)*, 283 N.W.2d 202, 209 (N.D.1979). *See also Stone v. Morris*, 546 F.2d 730, 735–36 (7th Cir.1976) (urging district court to consider these factors in deciding whether to allow imprisoned civil plaintiff to attend trial); *Strube v. Strube*, 158 Ariz. 602, 764 P.2d 731, 734–35 (1988) (establishing rebuttable presumption that prisoner is entitled to be present at critical proceedings and urging trial court to

balance these factors to determine when such presence is appropriate); *Hall v. Hall*, 128 Mich. App. 757, 341 N.W.2d 206, 209 (1983) (determining that while there is no absolute due process right of prisoners to appear in court in civil cases, fundamental fairness may require trial court to allow plaintiff opportunity to do so in certain situations, and indicating that these factors should form basis of court's decision).

**50.** AS 33.30.081(f).

various forms of telecommunicating. Likewise, when a party is denied an in-person hearing before a trier of fact, there is a risk that the party will be less able to convey the message that his story is the truth.[51]

Under the circumstances of this case, however, we do not believe the court abused its discretion in denying Richard's request to be transported to Bethel. While expressing his desire to be present at trial and intention to testify, Richard did not demonstrate to the court what specific information he intended to convey through his testimony that would depend on his credibility, nor did he present the court with any basis on which to believe that the outcome of the case would depend upon his presence. Without a specific offer of credibility-dependent evidence or a demonstration in his motion of any material issues he intended to dispute, the court was well within its authority to deny Richard's motion for transport.

This is especially true given the state's demonstration of the significant cost of transporting Richard to trial. The DOC argued that Bell's transport "would require an officer to bring [Richard] from Spring Creek by road to Anchorage, fly him to Bethel, house him at the crowded Bethel correctional center, YKCC, for a number of days and then bring him back down to Seward, all at great expense to the state." Additionally, the state maintained that transporting [Richard] would potentially lead to illegal overcrowding and would "create 'ripple' effects throughout the system and require significant planning and coordination." Moreover, Richard did not file his motion for transport to the Bethel correctional facility until September 28, at which point he asked to be relocated no later than October 4 so as to prepare for the October 16 trial. This provided the state with less than a week to arrange for the personnel, travel accommodations, and jail space necessary to facilitate Richard's presence at the termination trial. Given the

short time frame Richard's request presented the DOC with, we cannot say the court abused its discretion in denying Richard's request.

## C. The Court Did Not Violate Richard's Right to Procedural Due Process by Denying His Request To Be Transported to His Termination Trial.

### 1. Our case law has not established a procedural due process right of incarcerated parents to be transported to termination of parental rights trials.

Finally, Richard argues that under *Whitesides v. State, Department of Public Safety, Division of Motor Vehicles*,[52] we must recognize a due process right of an incarcerated parent to testify in person at a termination of parental rights trial. In *Whitesides*, we determined that where the credibility of an individual in a driver's license revocation hearing was at stake, due process requires that he be permitted to testify in person before a hearing officer.[53] As in Richard's case, the statute governing Whitesides's right to testify in person vested discretion in the hearing officer to determine whether in-person testimony was warranted. Specifically, AS 28.15.166(e) provides:

> The hearing under this section must be held by telephone unless the hearing officer finds that a telephonic hearing would *substantially prejudice* the rights of the person involved in the hearing or that an in-person hearing is *necessary* to decide the issues to be presented in the hearing.[54]

Whitesides argued "that since his credibility was at issue in the hearing, the due process clause of the Alaska Constitution affords him the right to present his testimony in person to the trier of fact."[55]

---

51. *Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles,* 20 P.3d 1130, 1137 (Alaska 2001).

52. 20 P.3d 1130 (Alaska 2001).

53. *Id.* at 1139.

54. AS 28.15.166(e) (emphasis added).

55. 20 P.3d at 1134.

In assessing Whitesides's claims, we looked to the United States Supreme Court's decision in *Mathews v. Eldridge*,[56] which set out the framework we have traditionally used in evaluating whether administrative proceedings comport with procedural due process requirements. Under *Mathews*, we will consider:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[57]

Analyzing Whitesides's claims under this test, we determined that a driver's license has been considered an important property interest, and that driver's license revocation proceedings are quasi-criminal in nature.[58] On the second factor, we reasoned that in certain situations reliance on telephonic testimony may create an unacceptable risk of an erroneous deprivation of the right to drive.[59] We emphasized that "[w]here the witness's truthfulness is disputed, demeanor can be important," [60] and observed that "the potential for empathy and nuanced understanding is much greater in person-to-person communications than in any of the various forms of telecommunicating." [61] We also noted that a party denied an in-person hearing before a trier of fact may "be less able to convey the message that his story is the truth." [62] Finally, we evaluated the government's interest, and considered whether the requirement of an in-person hearing would impose additional fiscal or administrative burdens on the government. We concluded that public safety would not be compromised by the provision of in-person hearings and that, except where hearing officers would have to travel to conduct in-person hearings, the increased cost to the taxpayer would be negligible.[63] Suggesting some less costly alternatives to travel, we concluded that "we do not think that providing in-person hearings to parties who want them, in cases where their credibility is at issue, must be significantly more costly than the present system." [64]

Upon a balancing of these three factors, we determined that a due process violation had occurred as a result of the hearing officer's denial of Whitesides's request for an in-person hearing.[65] In order to avoid a constitutional problem, we construed AS 28.15.166(e) as "requir[ing] in-person [license revocation] hearings where a party requests such a hearing and material questions depend on the credibility of the party's testimony." [66]

Richard has argued that our analysis in *Whitesides* requires us to read into AS 33.30.081(f) a due process right of incarcerated parents to be transported to proceedings where the state seeks to terminate their parental rights. DFYS takes a contrary position, arguing that the differences between Whitesides's circumstances and those faced by Richard require a distinct analysis under *Mathews v. Eldridge*.[67]

We agree with the state that our decision in *Whitesides* does not control this issue. In *Whitesides*, we considered whether a hearing officer must *permit an individual to appear* in person for a hearing. In Richard's case, we are asked to decide whether the state should be *required to transport a prisoner*

---

**56.** 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

**57.** *Id.* at 335, 96 S.Ct. 893.

**58.** *Whitesides*, 20 P.3d at 1135–36.

**59.** *Id.* at 1136–37.

**60.** *Id.* at 1137.

**61.** *Id.*

**62.** *Id.*

**63.** *Id.* at 1137–38.

**64.** *Id.* at 1138.

**65.** *Id.* at 1138–39.

**66.** *Id.* at 1139.

**67.** 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

across the state for a trial. While the interest in preventing the termination of one's parental rights is unquestionably greater than the interest in maintaining a driver's license, the burden that would be placed on the state in requiring the transport of prisoners is likewise greater than the negligible burden of allowing litigants to appear in person. In short, *Whitesides* does not control the outcome of this case.

### 2. Procedural due process does not require that every incarcerated parent be transported to a termination trial.

We recently addressed the circumstances under which the state will be required to transport a prisoner to a civil trial to which he is a party, in *Midgett v. Cook Inlet Pre–Trial Facility.*[68] In *Midgett,* an inmate in a federal prison in South Carolina requested transport to Anchorage to appear in a lawsuit he had brought against the state alleging negligence, constitutional violations, breach of contract and medical malpractice.[69] We noted that in most cases, "a prisoner has a due process right to reasonable access to the courts which cannot be limited unless the state's interests in security and rehabilitation of prisoners cannot be protected by less restrictive means."[70] In upholding the trial court's decision not to grant Midgett's request, we distinguished his case from *Whitesides* in three respects:

First, unlike *Whitesides,* in which the state affirmatively prosecuted an administrative action against a private person, Midgett has elected to sue here, placing the state in a purely defensive posture. Second, the state sought to deprive Whitesides of a valuable license; Midgett, on the other hand, simply asserts his economic interest

in recovering money damages. Third, *Whitesides* required the state to allow in-person testimony in the absence of any case-specific circumstances compelling telephonic proceedings. Here, by contrast, the state has shown compelling and case-specific reasons for a telephonic hearing: the extraordinary costs and security risk associated with transporting an out-of-state prisoner to Alaska for trial.[71]

We ultimately concluded that, because allowing Midgett to participate telephonically would not substantially prejudice his claim nor was his physical presence essential for a just disposition, the trial court had not erred in denying Midgett's request to be transported to Alaska.[72]

As Richard argues, the circumstances of his case are likewise distinguishable from those of Midgett's. Here, parental rights, which have in the past been accorded substantive due process protections, are at stake. Additionally, the state is not defending against a suit for monetary damages, but is attempting to use its power to deprive Richard of a fundamental right. Given the vastly different circumstances under which this case arose, Richard asks us to read AS 33.30.081(f) as requiring that incarcerated parents be brought to the courthouse whenever their credibility will be at issue in a termination proceeding.

The closest we have come to addressing this question in the past was in *E.J.S. v. State, Department of Health & Social Services.*[73] In *E.J.S.,* an incarcerated father[74] claimed that he had been denied his right to effective assistance of counsel and his due process right to confront and cross-examine witnesses against him due to his inability to hear the proceedings.[75] We rejected his

---

**68.** 53 P.3d 1105 (Alaska 2002).

**69.** *Id.* at 1108, 1112.

**70.** *Id.* at 1112 (referring to Jay M. Zitter, Annotation, *State Prisoner's Right to Personally Appear at Civil Trial to Which He is a Party—State Court Cases,* 82 A.L.R.4th 1063 (1990)).

**71.** *Id.* at 1112, n. 22.

**72.** *Id.* at 1113.

**73.** 754 P.2d 749 (Alaska 1988).

**74.** Appellant argues that E.J.S. was incarcerated in Washington State, and as such, is distinguishable from this case. The opinion is silent on E.J.S.'s location, although it does indicate that the child was born in Washington State and that the mother moved to Alaska with the child shortly thereafter. 754 P.2d at 750.

**75.** *Id.* at 752.

claims, reasoning that his attorney was present in the courtroom and effectively cross-examined the witnesses, that the transcript indicated that he could hear well enough, and that telephonic participation is sanctioned by Alaska Rule of Civil Procedure 99.[76] However, *E.J.S.* is distinguishable from the case at bar in that its discussion was limited to the due process rights of confrontation and cross-examination.[77] Additionally, the termination in *E.J.S.* was based on the father's abandonment of his daughter, a determination largely based on objective evidence.[78]

Whether Richard can be said to have been deprived of due process in this situation depends on the balancing of the three factors identified in *Mathews v. Eldridge*,[79] the individual interest at stake, the value the desired procedure adds to the proceedings and the competing governmental interest.[80]

### a. The interest of parents in raising their children

As both Richard and DFYS agree, "[t]he right to care and custody of one's own child is a fundamental right recognized by both the federal and state constitutions."[81] We have characterized this right as "one of the most basic of all civil liberties,"[82] and recognize that it clearly falls within the protections of the due process clause and should be accorded significant weight.

### b. The risk of wrongful deprivation of the right to raise one's children due to reliance on telephonic testimony and the probable value added by in-person testimony

The value of live testimony was attested to at length in our opinion in *Whitesides*.[83] As we recognized, the trial court is in a unique position to judge the credibility of a party or witness who testifies before it.[84] In situations where one's credibility is at issue, "denying an in-person hearing denies a party an opportunity to present evidence in the most effective way possible."[85]

In this case, Richard argues that his telephonic testimony was inadequate. He contends that he had difficulty communicating basic information to the court, and adds that "the forum did not provide [him] with an adequate opportunity to convey his credibility to the court." He claims that he offered testimony designed to demonstrate that he has taken steps to eliminate sexual abuse, alcoholism, and domestic violence from his life, and that he was committed to maintaining those changes in the future. He argues, "[t]he most compelling evidence [Richard] had to offer was his testimony. [Richard's] credibility was essential to his defense against the petition to terminate his parental rights.... The trial court's denial of his motion to transport to Bethel deprived [Richard] of the most effective weapon in his arsenal, the ability of the trier of fact to personally witness his demeanor as he testified."

In response, the state contends that Richard's credibility was not an issue on any material matter. First, the state maintains that Judge Curda had ample opportunity to observe Richard's credibility and demeanor during the course of his CINA case, as well as on his domestic violence assault and attempted sexual assault of a minor charges. Next, the state argues that Richard never specifically requested to be transported *because* his credibility was at issue. Finally, the state asserts that while Richard denied the conduct underlying his conviction for sexual abuse of a minor, "whether or not [Rich-

**76.** *Id.*

**77.** *Id.*

**78.** *Id.* at 751.

**79.** 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

**80.** *Id.* at 335, 96 S.Ct. 893.

**81.** *J.M.R. v. S.T.R.*, 15 P.3d 253, 257 (Alaska 2001).

**82.** *Flores v. Flores*, 598 P.2d 893, 895 (Alaska 1979).

**83.** 20 P.3d at 1136–37.

**84.** *Id.* at 1136.

**85.** *Id.* at 1137.

ard] attempted to sexually abuse [Cynthia] was not a material issue in the case." The state concludes that because "[Richard] did not contest that he had been charged with sexual abuse of a minor, that he had pled no contest to one count of attempted sexual abuse of a minor, and that he was incarcerated at the time of trial on that conviction[,] ... no issue of credibility was presented."

The state's argument is convincing. Throughout his testimony, Richard did not dispute, but instead corroborated his history of domestic violence, substance abuse, and related criminal charges and convictions (except the sexual abuse charge). While other facts formed additional bases on which to terminate his parental rights, Richard's testimony alone established sufficient facts to support the charges of domestic violence, other criminal charges, and substance abuse against him. Whether the court found Richard's testimony on these issues credible was irrelevant, because he largely admitted the state's case and the state presented other evidence to support that case. Further, Richard would ordinarily have been precluded by his conviction from denying the conduct on which it was based.[86] Because Richard was challenging his conviction through an application for post-conviction relief when the issue arose, however, it is not necessary to rely on this point. Accordingly, we find that Richard's credibility was not at issue on any material matter and therefore that any value added by in-person testimony in this case would have been negligible.

### c. The interests of the government and the financial and administrative burdens the government would incur as a result of requiring transport of prisoners for the purpose of in-person testimony

 The primary government interests involved here are those of avoiding the cost, administrative burden, and potential dangers of transporting prisoners. In support of its

position that the cost of transporting Richard to the termination hearing would be prohibitive, the state argued that Richard's transport "would require an officer to bring [Richard] from Spring Creek by road to Anchorage, fly him to Bethel, house him at the crowded Bethel correctional center, YKCC, for a number of days and then bring him back down to Seward, all at great expense to the state." Additionally, the state maintained that transporting Richard would potentially lead to illegal overcrowding and would "create 'ripple' effects throughout the system and require significant planning and coordination."

Adding to the state's burden in this situation is Richard's untimely request for transport. As discussed earlier, with trial scheduled to being on October 16, Richard moved on September 28 to be relocated to the Bethel correctional facility no later than October 4. This provided the state with less than a week to arrange for the personnel, travel accommodations, and jail space necessary to facilitate Richard's presence at the termination trial. The high administrative and financial costs of transporting Richard to trial, coupled with the untimeliness of his motion, weigh heavily against a finding that due process required his transport.

### d. The circumstances of Richard's case do not require his in-person participation.

 Richard maintains that given the importance of the interest at stake, the demonstrated benefits of in-person testimony, and the merely generalized assertions of expense and inconvenience articulated by the state, due process requires that we read AS 33.30.081(f) as guaranteeing him the opportunity to testify in person. He concludes that "when a fundamental right is at stake, due process requires that the costs to the state take a lesser priority, to insure that an individual is not wrongly deprived of a funda-

---

86. See Lashbrook v. Lashbrook, 957 P.2d 326, 330 n. 2 (Alaska 1998) (defendant in custody dispute precluded from challenging facts that constitute elements of offenses to which he pled no contest); Burcina v. City of Ketchikan, 902 P.2d 817, 822 (Alaska 1995) (holding, "based on public policy grounds, that a civil plaintiff is collaterally estopped from relitigating any element of a criminal charge to which he has pled nolo contendere.").

mental right." Richard oversimplifies our analysis.

In every case we must weigh not only the interests at stake but the benefits and burdens that would result from implementing the proposed rule. Richard looks only to his interest—which assuredly is fundamental—and the state's—which is important but not fundamental—and concludes that he must by definition prevail. But he has failed to consider the extent to which his proposed rule would advance his interest and the extent to which it would burden the state's interest. When this analysis is considered, the balance tips decidedly in the state's favor.

We turn first to the extent to which Richard's interest in his parental rights would be furthered by a rule that he must be allowed to participate in person in the termination proceeding. In *Whitesides* we held that where a tribunal must make a judgment regarding credibility, the individual must be given the opportunity to appear in person before the hearing officer. Here, however, as we have seen, Richard's credibility was not central to the court's decisionmaking process.[87] Conversely, the burden on the state's interests of a rule requiring prisoner transports in all termination proceedings would be substantial. Financial costs to the state of moving prisoners would be high, and the administrative burden on the Department of Corrections would be increased by the frequent need to transfer prisoners out to make room for incoming prisoners or face legal action for overcrowding.[88] And as previously noted, significant planning and coordination will often be necessary to accomplish such transfers, and in this case Richard gave little notice to the Department of Corrections of his request to attend the trial in person.[89]

Our holding today is limited and tied closely to the facts of this case. We hold that due process does not in all cases require the transport of an incarcerated parent to a trial to decide the termination of parental rights. The trial court must consider all relevant factors, including the disputed issues, whether a parent plans to testify, the relevance of a parent's testimony to the disputed issues, the costs to the state—financial, administrative, and legal—and any threat to public safety, in deciding whether to grant a motion by a parent to be transported to a termination hearing. On the facts of this case, Richard has not established that his due process rights were violated by Judge Curda's decision not to order the Department of Corrections to transport Richard to the hearing but to allow him to participate telephonically.

## V. CONCLUSION

Because we find that the superior court abused its discretion in allowing Henderson & Kay to represent Leslie despite Kay's prior representation of Richard in a related matter, we REMAND for a determination of whether Richard was adversely affected by that representation in this matter, that is, whether Henderson & Kay's conflicting interest had any appreciable effect on the outcome of the termination proceedings. We AFFIRM the superior court's denial of Richard's motion for transport and conclude that it did not violate Richard's right to due process.

---

**87.** *See supra* Part IV.C.2.b at 37–40.

**88.** *See supra* Part IV.C.2.c at 40.

