**SETH D., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, OFFICE OF CHILDREN SERVICES, Appellee.**

**No. S–12621.**

Supreme Court of Alaska.

Jan. 17, 2008.

George J. Dozier, Jr., Eagle River, for Appellant.

Megan R. Webb, Assistant Attorney General, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Devinder Brar, Anchorage, for Guardian Ad Litem Shelly Wilson–Schoessler.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

A father who was a state prisoner asked to be transported so he could attend the trial on the state's petition to terminate his parental rights. The superior court denied his requests and, following a six-day trial, terminated his parental rights. He argues here that denying his motion was both an abuse of discretion and a denial of procedural due process. He also argues that it was error to terminate his parental rights. Because he participated telephonically the first four days of trial, personally attended the last two days, and testified in person, there was no deprivation of due process. And because he testified in person and was given an adequate opportunity to participate and confer telephonically with his lawyer during the first four days of trial, any possible error in applying AS 33.30.081 was harmless. We also conclude that the superior court did not commit clear error in terminating the father's parental rights. We therefore affirm.

## II. FACTS AND PROCEEDINGS

Lacey D. is the daughter of Seth and Tiffany D.[1] She was born in January 2001.[2]

The Alaska Office of Children's Services (OCS) first received a report of harm regarding Lacey in June 2002 but closed its file because the family could not be located. When it received a second report of harm in December 2002, OCS located Seth and Tiffany and conducted a home visit to their apartment. During the visit, the social worker found a marijuana grow operation in the apartment. OCS consequently requested that Seth be tested for illegal substance use. The results were positive. OCS therefore recommended that Seth participate in substance abuse treatment and prepared a care and safety plan. He refused to comply with OCS's recommendation and only engaged with OCS through counsel.

In February 2003 OCS requested a temporary custody hearing. After a hearing the superior court entered a temporary custody order, finding that there was probable cause to believe Lacey was a child in need of aid under AS 47.10.011(6), (9), and (10). The court granted OCS temporary custody; OCS then allowed Lacey to remain in Seth's care.

In July 2003 Seth stipulated that Lacey was "a child in need of aid pursuant to AS 47.10.011(1) and (10) for the reasons stated in the petition for adjudication filed in February 2003." The superior court adopted the stipulation the same day Seth signed it.

Seth began a new plan with OCS in September 2003. Lacey was still in his physical custody and they appeared to be healthy, happy, and well-bonded.

Seth was jailed in November 2003 for violating the terms of his probation by testing positive for illegal substances, and Lacey was removed from his custody. OCS briefly placed Lacey with her maternal grandmother before placing her in foster care in Kenai. In November 2003, following a November 25 hearing, the superior court granted OCS custody of Lacey for up to two years.

In April 2004, after Seth's release from jail, Lacey was placed with Seth to begin trial home visits. The placement seemed acceptable to the social worker, but while Lacey was in Seth's physical custody he was twice charged with shoplifting; he missed his arraignment on one of the charges, and a warrant was issued for his arrest.

Seth was arrested in August 2004 while Lacey was present. The arresting officer thought he appeared to be very high. Tiffany was also arrested at this time. Lacey reacted to seeing her father in handcuffs and her mother's arrest by screaming, crying, acting frantic, and pleading with the officers not to arrest her mother.[3] When arrested

---

1. We have used pseudonyms throughout this opinion to protect the privacy of family members.

2. Lacey is not an Indian child within the meaning of the Indian Child Welfare Act of 1978, 25 U.S.C. § 1901 et seq.

3. It is somewhat unclear exactly when Seth and Tiffany were in contact during Lacey's life. It is clear that he was staying with Tiffany at this time.

Seth possessed prescription morphine pills that had not been prescribed to him. Lacey was removed from Seth's custody in August 2004.

OCS filed a petition in February 2005 to terminate Seth's parental rights. It amended the petition about a year later. Trial was scheduled for the week of August 7, 2006.

Seth, who was then a prisoner of the State of Alaska, filed a mid-July 2006 motion asking that he be transported to the parental-rights termination trial so he could attend the trial and testify.[4] The court denied the motion on August 1. Seth gave additional reasons for his motion on the first morning of trial. The superior court again denied the motion. Trial was conducted over six days, on August 7, 8, 10, 11, and September 7 and 8, 2006. Seth remained incarcerated until mid-August 2006. He participated telephonically from jail the first four days of trial and was physically present the last two. Twenty-four witnesses, including Seth himself, testified.

Following trial, the superior court found that Lacey was a child in need of aid under AS 47.10.011(1), (8), and (10).[5] The superior court also found that Seth had not remedied the conduct or conditions that put Lacey at substantial risk of harm, that OCS had complied with the reasonable effort requirements of AS 47.10.086, and that it was in Lacey's best interests to terminate Seth's parental rights. The court also made findings justifying the termination of Tiffany's parental rights. The court then ordered Seth and Tiffany's parental rights terminated.

Seth appeals.[6]

## III. DISCUSSION

### A. Standard of Review

■ We review decisions regarding the telephonic trial or hearing appearance of a party for abuse of discretion.[7] We review de novo whether a decision requiring a parent who is a state prisoner to participate telephonically rather than be transported violates his right to due process.[8] We will reverse the factual findings of the superior court in a parental rights termination case only when they are clearly erroneous, a standard met only if we are left with a definite and firm conviction that a mistake has been made after review of the entire record.[9] When reviewing factual findings, we view the evidence in the light most favorable to the party prevailing below.[10] Whether the trial court's findings are consistent with the child-in-need-of-aid statutes is a question of law that we review de novo.[11] We bear in mind at all times that terminating parental rights is a drastic measure.[12]

### B. The Superior Court Did Not Violate Seth's Right to Due Process by Denying His Motion for Transport.

■ Seth argues that he was denied his due process right to be present in the courtroom throughout the trial by the superior court's denial of his motion for transport.[13]

---

4. AS 33.30.081 governs the transport of prisoners to trials in which they are parties.

5. The superior court did not directly cite AS 47.10.011(8) in its Findings, Conclusions, and Order Terminating Parental Rights and Responsibilities. Nonetheless, the superior court made findings and a conclusion that appear to satisfy subsection .011(8).

6. Although Tiffany's parental rights were also terminated, she has not appealed.

7. *Richard B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 71 P.3d 811, 817 (Alaska 2003).

8. *Id.* (citing *Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles*, 20 P.3d 1130, 1134 (Alaska 2001)).

9. *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003).

10. *Id.*

11. *Id.*

12. *Id.*

13. Under AS 33.30.081(f):

A court may order a prisoner who is a party or a witness to a civil action ... to appear at a place other than within a correctional facility only if the court determines, after providing a reasonable opportunity for the commissioner to comment, that the prisoner's personal appearance is essential to the just disposition of the action. In making its determination, the

He first asked about three weeks before trial was to begin to be present at trial so he could testify in person as well as hear the witnesses and see the evidence. He next asked at the beginning of the first day of trial to be transported so he could hear the witnesses and see the evidence himself because he has a learning disability.

There was no violation of Seth's due process rights on the first ground he raised— attendance so he could testify in person and the court could assess his credibility—because he did in fact testify in person at trial after his incarceration ended mid-way through the trial. Similarly, any possible error in failing to grant Seth's motion to transport so he could testify in person was also harmless.[14]

Seth's second argument for transport, made on the first day of trial, advanced a new theory. It was founded on his assertion that a learning disability made his personal attendance necessary so he could hear the witnesses and see the evidence.

We have stated that case law has not established a procedural due process right of incarcerated parents to be transported to parental rights termination trials.[15] In *Richard B. v. State, Department of Health & Social Services, Division of Family and Youth Services*[16] we refused to extend the holding of *Whitesides v. State, Department of Public Safety, Division of Motor Vehicles*[17] to termination trials. In *Richard B.* we dis-

tinguished *Whitesides*, stating "[i]n *Whitesides* we considered whether a hearing officer must *permit an individual to appear* in person for a hearing" whereas in a termination hearing "we are asked to decide whether the state should be *required to transport a prisoner* across the state for a trial."[18]

■ Although transportation of an incarcerated parent to attend a termination trial is not required by due process, we have applied the balancing test of *Mathews v. Eldridge* to determine whether a parent was deprived due process in a termination hearing.[19] That test requires the court to consider:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[20]

We now consider the three factors.

■ **Interest of a parent.** Seth correctly points out that the "right to the care and custody of one's own child is a fundamental right recognized by both the federal and state constitutions."[21] This right is one

court shall consider available alternatives to the prisoner's personal appearance including deposition and telephone testimony.

The trial court has significant discretion in determining whether to grant an incarcerated parent's request to be transported to a termination trial. *Richard B.*, 71 P.3d at 827.

14. Although the court agrees with many of the comments contained in the concurring opinion, the fortuity of Seth's release in time for him to testify in person at trial makes it unnecessary here to explore what due process and the transportation statute minimally require when prisoners seek to testify at the trial on state petitions to terminate their parental rights.

15. *Richard B.*, 71 P.3d at 828.

16. *Richard B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 71 P.3d 811, 829–30 (Alaska 2003).

17. *Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles*, 20 P.3d 1130, 1139 (Alaska 2001) (holding that when credibility of party is in issue at license revocation hearing, an in-person hearing is required).

18. *Richard B.*, 71 P.3d at 829–30 (emphasis in original).

19. *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), cited in *Richard B.*, 71 P.3d at 831.

20. *Richard B.*, 71 P.3d at 829 (quoting *Mathews*, 424 U.S. at 335, 96 S.Ct. 893).

21. *J.M.R. v. S.T.R.*, 15 P.3d 253, 257 (Alaska 2001).

of the most basic of all civil liberties.[22] The right to custody of one's own child "clearly falls within the protections of the due process clause and should be accorded significant weight." [23]

**The risk of wrongful deprivation.** Seth argues that there was a high risk of an erroneous decision because his ability to participate was undermined by his mental handicap. Seth contends he suffers from a lack of verbal comprehension, and points to his trial testimony that he does not understand "vocabulary" and that he struggles with comprehension because "there's no vocabulary that breaks down those words." [24] Seth argues here that "[h]ad he been present and sitting with his attorney he could have cleared up any questions regarding the testimony by simply asking his attorney for an explanation."

The state contends that the evidence shows that Seth's learning disability is not auditory in nature, implying that his disability did not prejudice his telephonic trial participation. The state also points out that a previous test placed Seth's IQ in the normal range; [25] that trial testimony is consistent with the contention that Seth's learning disability was related to reading comprehension but that he has no problems with understanding information if someone reads aloud to him; and that there was no evidence or representation before or during Seth's telephonic participation at trial that Seth could not understand the trial events and evidence being presented.

We have held that an individual's due process right to confront and cross-examine witnesses was not denied when he participated telephonically.[26] Furthermore, even assuming Seth's disability extends to verbal comprehension, Seth fails to show how the trial would have been different had he been sitting next to his attorney. There is no evidence that Seth could not understand the trial. At no point during his telephonic participation did Seth assert that he was having trouble understanding the information presented.[27]

**The interest of the government.** The primary government interests involved are the costs and administrative burden of transporting a prisoner to trial. In opposing Seth's motion for transport the Alaska Department of Corrections (DOC) discussed the cost of transport and asserted that transporting Seth from Seward to Kenai and back would cause an unnecessary expenditure of state resources because it would require the presence of understaffed judicial services officers, which could cause delay in other trials and require overtime pay.

Seth argues that due process was not met because the case involved a fundamental right, his learning disability required his presence in the courtroom, and the administrative costs were "negligible."

We must weigh the interests at stake along with the benefits and burdens that would result from implementing the pro-

22. *Flores v. Flores*, 598 P.2d 893, 895 (Alaska 1979).

23. *Richard B.*, 71 P.3d at 831.

24. Seth also relies on the testimony of witnesses who testified that he may need someone to explain words to him to help reading comprehension; that he has trouble responding to written questions; that he has to have someone read written questions to him; that he had previously asked a case worker to read his plan to him because he feared he would be unable to understand it himself; and that Seth's vocabulary deficiency affects both reading and verbal comprehension. This evidence, and this theory for attendance, were not presented to the superior court when Seth last requested, on the first day of trial, that the court order him transported for trial.

25. The state notes that at the pretrial discussion the guardian ad litem (GAL) pointed out that Seth had a low verbal score but that there was a discrepancy with the score. Citing the previous IQ report, the GAL told the superior court that "there was hope that would advance and that he could compensate by verbal learning."

26. *E.J.S. v. State, Dep't of Health & Soc. Servs.*, 754 P.2d 749, 752 (Alaska 1988) (holding that father's right to due process was not violated by his telephonic participation in termination hearing).

27. The superior court gave Seth an opportunity to interrupt at trial if he had comprehension difficulty. See Part III.C. The court even stopped the trial at one point when Seth said that he was having trouble hearing the proceedings.

posed rule.[28] Balancing the factors, we conclude that Seth's right to due process was not violated. Even though the DOC's showing of cost and burden associated with transporting Seth was remarkably nonspecific and conclusory, and even though the trial and procedure undoubtedly implicated Seth's fundamental rights, he has failed to show on appeal how the risk of infringing on his rights could have been assuaged by his personal presence for the first four days of trial.[29]

### C. The Superior Court Did Not Abuse Its Discretion in Denying Seth's Request To Attend the Parental Rights Termination Trial.

■ Seth also argues the superior court abused its discretion by refusing to order his transport to trial. On appeal, Seth argues that the state failed to present evidence of the actual costs of transportation, that Seth's physical attendance would not have presented a substantial risk of danger, that the issues involved in trial were of the "utmost significance," that the court failed to continue the trial, and that the "need for [Seth's] personal attendance was of the highest order" because telephonic participation failed to protect his interest in light of his learning disability. Seth argues that the court could not actually assess the costs of transport because the state failed to provided detailed financial information about the costs.

It is important to keep the sequence of Seth's arguments in mind.

**Need to testify.** Seth's pretrial motion for transport argued that he needed to be present to testify. This basis for relief was satisfied when Seth personally attended the last two days of trial and testified live. Any error in failing to grant the motion on this basis was therefore harmless. We note, however, that this basis would have made denial problematic had Seth not been fortuitously released from prison mid-trial.

**Learning disability.** The trial court denied Seth's motion for transport and explained its decision on the first day of trial. Responding to this ruling, Seth argued that his presence was necessary because he had a learning disability that would make it more difficult for him to understand and process information without being present at trial to talk to counsel. Seth broadly suggested that evidence would support this assertion but presented no evidence then or later to confirm this alleged disability or to suggest how trial would be different if he were present.

Responding to the learning disability arguments, the court ruled that telephonic participation was adequate for a fair trial. The court also told counsel that:

> I'll do anything that I can to make it easier for you. If you need a break to stop and talk with your client, we'll do that, you know, shut things down and give you a place where you can talk to [your client] privately. We'll do whatever we can to accommodate this less than perfect situation.

Only later in the trial did Seth explain that his learning disability arose out of either auditory problems or a failure to understand words, making it necessary for him to attend trial. Because Seth had not raised that contention earlier, it was not before the court on the first day of trial, when Seth last renewed his request for transportation. Based on what the superior court heard before testimony began on the first day of trial, the court could have justifiably thought that the telephonic-attendance procedure it adopted—including the availability of breaks to confer with counsel—was sufficient to allow Seth to be an active participant.[30] The court did not abuse its discretion in denying Seth's renewed request for transport on the first day of trial.

**Assist counsel.** On appeal Seth also argues he needed to be present to assist coun-

---

**28.** *Richard B.,* 71 P.3d at 833.

**29.** As noted above, Seth attended the last two days of trial and testified in person. This is not a case in which a parent was denied an opportunity to testify in person.

**30.** We express no opinion whether this would have been sufficient to satisfy either due process or the transportation statute had Seth not ultimately been able to attend the trial personally and testify live.

sel during trial. He first offered this explanation on the first day of trial, but he failed to demonstrate that his physical presence was needed at the trial to assist his attorney. The superior court gave him the opportunity to confer with counsel by telephone. We therefore conclude that the superior court did not abuse its discretion in denying Seth's motion to transport.

Even though we have concluded that Seth was not denied due process and that the trial court did not abuse its statutory discretion, this case illuminates potential problems concerning the transportation statute[31] and a parent's due process right to testify at a termination trial. As we saw above, due process guarantees apply to termination proceedings. Parents have a fundamental right to the care and custody of their children and this right does not immediately cease when a parent is incarcerated. When applied to termination proceedings, the transportation statute, AS 33.30.081(f), appears to provide a reasonable balance between a parent's interests in being present at a termination proceeding and the state's interests in dealing with state prisoners. The statutory standards, if rigorously followed, seem likely to satisfy due process.

If a parent wishes to testify at a termination trial, the state must present sufficient specific evidence allowing the superior court to decide knowledgeably whether to grant a motion for transport made under AS 33.30.081.[32] Here DOC's entire analysis of the dispute was contained in one paragraph of its opposition to Seth's motion to transport:

[Seth's] transport will cause the unnecessary expenditure of state resources to transport him from Seward to Kenai for trial and then back to Seward. [Seth's] presence at trial would also require understaffed judicial services officers to be present in the courtroom for the entirety of the four-day trial which could cause delay in other proceedings and could result in overtime for judicial services.

This paragraph lacks sufficient analysis or information to allow a superior court to properly weigh whether to grant a motion to transport.

We addressed a superior court's denial of a motion to transport in *Richard B.*[33] In that case we concluded that the trial court did not abuse its discretion in denying a prisoner's request to attend a parental rights termination proceeding.[34] A Seward prisoner sought transport to attend a Bethel trial.[35] The state argued that transport would require an officer to transport the prisoner from Seward to Bethel and back, and that the state would have to house the prisoner in a crowded Bethel facility for a number of days.[36] The state also showed that transporting the prisoner would possibly illegally overcrowd the prison system, create a ripple effect of prisoner transport within the system, and could require significant planning and coordination.[37] We affirmed the superior court's denial of the prisoner's request because the state's demonstration of significant transportation costs was persuasive.[38]

But as Seth argues here, Kenai is not far from Seward, where he was imprisoned. Both communities are on the road system. Seth did not have to be moved across a long distance at great expense, un-

31. AS 33.30.081.

32. We focus our discussion here on a parent's right to testify at trial, not on the right to be present, because the right to testify involves a higher degree of participation in the trial process and therefore imposes a greater limitation on the superior court's discretion. As discussed earlier, it is hard to imagine how being present at trial, but not testifying, would be any different than telephonic participation conducted properly per our previous decisions. No party argues here that modern video conferencing would not have been an adequate alternative to personal attendance.

33. *Richard B.*, 71 P.3d at 811.

34. *Id.* at 828.

35. *Id.* at 816.

36. *Id.* at 828.

37. *Id.*

38. *Id.*

like the prisoner in *Richard B.*[39] We assume based on DOC's opposition that transporting Seth would have affected personnel assignments, security, and expense. But neither DOC nor the Department of Public Safety made any adequate showing about what might have been required. The state did not even discuss any security risk Seth might have presented. Had Seth's incarceration not ended in time for him to testify live at trial, DOC's opposition would be slender support for the superior court's decision to deny the motion to transport. Therefore, in the future, in opposing a transport motion made by an imprisoned parent seeking to testify at a termination proceeding, the state must provide a specific showing, and the trial court must determine whether the state's showing is specific and sufficient before denying a motion to transport.

### D. The Superior Court Did Not Err in Terminating Seth's Parental Rights by Determining that Lacey Is a Child in Need of Aid.

 Seth argues the superior court erred in terminating his parental rights because there was not clear and convincing evidence to support a finding that Lacey was a child in need of aid under AS 47.10.011(1) (the parent has abandoned the child), (8) (the parent's conduct has led to mental injury), and (10) (the ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant).

Because we affirm the superior court's holding that Lacey was a child in need of aid on one of the three bases found by the superior court, there is no need to consider the other two.[40]

We therefore consider the superior court's determination that Lacey was a child in need of aid under AS 47.10.011(10) because it found that Seth's ability to parent had been affected by his use of intoxicants. Seth argues that there was no evidence that his ability to parent had been affected by his use of intoxicants. He argues that two social workers never saw him impaired when they visited to check on Lacey. He also argues that the presumption contained in AS 47.10.011(10)—that a relapse within one year is prima facie evidence of substantial impairment—does not apply because he was still in treatment.

Alaska Statute 47.10.011(10) states that a child is in need of aid if the parent's "ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child." The presumption states that "the resumption of use of an intoxicant by a parent ... within one year after rehabilitation is prima facie evidence that the ability to parent is substantially impaired."[41] In *Stanley B. v. State, DFYS*, we upheld the superior court's finding that Stanley's ability to parent had been affected by his use of intoxicants.[42] In that case, we said that subsection .011(10) may be satisfied by evidence that a parent's drug use is "at least partially responsible for his current and past incarcerations, and that his frequent and prolonged absences while incarcerated substantially impair his ability to parent."[43]

Here there was sufficient evidence for the superior court to find under AS 47.10.011(10) that Seth's ability to parent had been substantially impaired by his addictive use of intoxicants and that this use had resulted in a substantial risk of harm to Lacey. In making its finding under subsection .011(10), the trial court relied on: testimony that Seth had ongoing problems with addiction to prescription and illicit drugs; treatment program records showing that Seth participated

**39.** *Id.* at 816.

**40.** *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 54 n. 14 (Alaska 2003) (stating "[b]ecause we affirm the trial court's holding that Amanda was a child in need of aid on the bases of AS 47.10.011(6) and (8), it is not necessary to reach the third issue of whether she was also a child in need of aid on the basis of AS 47.10.011(2)"); *see*

*also Rick P. v. State, OCS*, 109 P.3d 950, 956 (Alaska 2005).

**41.** AS 47.10.011(10).

**42.** *Stanley B. v. State, DFYS*, 93 P.3d 403, 407 (Alaska 2004).

**43.** *Id.* at 407.

in programs to treat opioid dependence, cannabis abuse, and cocaine abuse; evidence Seth was discharged from a number of treatment programs for a variety of reasons; evidence of Seth's relapse with morphine for six days; evidence of Seth's attempt to steal money and drugs from the police while he worked as a confidential informant; records of Seth's no-shows and refusal to submit to urine analysis, and positive tests; and evidence Seth cut off his ankle monitor and absconded from a treatment program.

Seth argues that his use of intoxicants did not expose Lacey to a substantial risk of harm. Seth points out that two social workers noted that he was attentive toward Lacey and that she appeared to be doing well in his care. Seth further argues that there was no evidence that he exposed Lacey to a drug operation. The state responds that Seth was often unable to parent Lacey because he was incarcerated or under house arrest as a result of his criminal conduct, which was linked to his substance abuse. Additionally the state asserts that Seth potentially exposed Lacey to "members of the criminal element" and risks inherently associated with drug use, drug buys, and a marijuana grow operation. This was substantial evidence that Seth's substance abuse exposed Lacey to a substantial risk of harm as it led to, among other problems, the marijuana grow operation in the home in which Lacey lived, and caused Seth to be absent for much of Lacey's life.

There was therefore substantial evidence upon which to find Lacey was a child in need of aid under AS 47.10.011(10). There was sufficient evidence on the record to find that Seth had an addiction to prescription and illegal intoxicants. It appears that many of Seth's legal problems and incarcerations were related to his use of intoxicants and that his use resulted in substantial harm to Lacey.

Because we conclude that the superior court did not err in finding facts demonstrating that Lacey was a child in need of aid under AS 47.10.011(10), we do not need to address the presumption contained in that subsection.

### E. The Superior Court Did Not Err in Finding that Seth Failed To Remedy His Conduct.

 Seth argues that there was no clear and convincing evidence that he failed to remedy his substance abuse. He claims the superior court should take into consideration the difficulties facing the parent when determining a reasonable time to remedy addiction. He asserts the superior court should have taken his comprehension difficulties into consideration, giving him more time to remedy his addiction. He examines the factors under AS 47.10.088(b) [44] and concludes he should have been granted more time.

In finding that Seth had not remedied his conduct in relation to his use of intoxicants, the superior court relied on evidence that Seth had not successfully completed a treatment program, had not refrained from using illegal substances, and had not refrained from engaging in criminal activity resulting in arrest. Although the court noted that Seth had presented evidence of his completion of treatment, it did not find the evidence persuasive because Seth refused to allow OCS to provide collateral information, and he continued to obtain prescription medications.

The superior court also found that Seth had not remedied his conduct and that placing Lacey with him would place her at substantial risk of physical or mental injury. The court based this finding on the fact that Seth had not completed any of the recommendations from his various treatment programs, and the fact that if Seth were to successfully begin a treatment program, including substance abuse and psychological examination, there would be a considerable

---

44. AS 47.10.088(b) states that in determining whether the parent has remedied the conduct that put the child at substantial risk of harm, the court may consider:

(1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;

(2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
(3) the harm caused to the child;
(4) the likelihood that the harmful conduct will continue; and
(5) the history of conduct by or conditions created by the parent.

amount of time before OCS could even start a trial home visit to reunite Lacey with Seth.

There was sufficient trial evidence to permit the court to find by clear and convincing evidence that Seth had failed to remedy his conduct related to his substance abuse. The superior court did not err in deciding that it was not in the best interest of the child to give Seth more time to remedy his conduct.

**F. The Superior Court Did Not Err in Finding that Terminating Seth's Parental Rights Was in Lacey's Best Interest.**

■ Alaska Statute 47.10.088(c) requires the superior court to consider the best interests of the child when deciding whether to terminate a parent's parental rights.

Seth argues that terminating his parental rights is not in Lacey's best interest because he is devoted to her and there is evidence he and Lacey had a strong bond.[45] In light of this strong bond he argues it would not be in Lacey's best interest to place her in another foster home.

The state argues that there was sufficient evidence to support the superior court's finding that it was in Lacey's best interest to terminate Seth's parental rights. The state points to evidence presented at trial that Lacey has been involved with OCS for most of her life, including over twenty-four consecutive months in foster care, and needs permanency. The state also argues that Seth would not be in a place to care for Lacey in the foreseeable future due to his need to complete substance abuse treatment and the fact that he was still on electronic monitoring.

The brief of the GAL also argues that it is in Lacey's best interest to terminate Seth's parental rights. The GAL presented evidence in support of its conclusion that was largely similar to the state's arguments. The GAL additionally points out that because of his legal problems Seth was not present when Lacey was an infant, leading her to spend her "tender years" in the homes of different adults, and that Seth's behavior over the three years leading up to the termination trial demonstrated an unwillingness to change to reunify with Lacey. The GAL admits that Seth is at times a loving and devoted father, but that on the whole he is unable to break away from his drug use.

Although Seth may be a devoted father and may believe he has a bond with Lacey, ample evidence supports the superior court's best-interest determination. The superior court therefore did not err in finding that terminating Seth's parental rights was in Lacey's best interest.

## IV. CONCLUSION

We therefore AFFIRM the termination decision.

BRYNER, Justice, not participating.

FABE, Chief Justice, with whom CARPENETI, Justice, joins, concurring.

I agree that because Seth D. eventually testified in person at trial, his due process claim must fail. I write separately to express my view that the cost of transportation, standing alone, should not suffice as grounds for denying a prisoner the right to testify in person at trial on termination of parental rights. Our case law makes clear that the trial court erred in ruling that Seth's telephonic testimony "was adequate for a fair trial." Only the fortuity of Seth D.'s release from prison before the conclusion of his hearing rendered the superior court's decision to deny transport harmless error.

The constitutional protections afforded in-person testimony reflect subtle but important shortcomings of telecommunications technology. We have recognized that "the potential for empathy and nuanced understanding is much greater in person-to-person communications than in any of the various forms of telecommunicating."[1] Consequently, "when a

---

**45.** Because Seth's challenge to the superior court's best-interest-of-the-child determination goes to the facts underlying the determination, we review the determination for clear error. *See Jeff A.C., Jr. v. State,* 117 P.3d 697, 707 (Alaska 2005); *Stanley B.,* 93 P.3d at 408.

**1.** *Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles,* 20 P.3d 1130, 1137 (Alaska 2001).

party is denied an in-person hearing before a trier of fact, there is a risk that the party will be less able to convey the message that his story is the truth." [2] In other words, appearing in person supplies an essential component of the right to testify.

The cost of transporting a prisoner from Seward to Kenai certainly falls well short of justifying a decision to deny a prisoner the right to testify in person in a termination trial. Indeed, we have never held that the mere cost of transportation should suffice as grounds for denying a prisoner's right to testify in person where a fundamental right is at stake. In *Richard B.*, the trial court denied the request for transport not only because it would have involved significant expense but also because flying Richard from Anchorage to Bethel "would potentially lead to illegal overcrowding and would create ripple effects throughout the system and require significant planning and coordination." [3] Similarly, in *Whitesides* our decision turned on our determination that public safety, "[t]he foremost government interest involved in driver's license revocation proceedings, . . . will not be prejudiced by providing a person who is under threat of license revocation with an in-person hearing." [4] We held in favor of in-person hearings despite our recognition that in some circumstances, "travel costs and travel time for hearing officers will be greater for in-person hearings than for telephone hearings." [5]

As the court today has noted, *Whitesides* is distinguishable in that we did not require the state to transport a prisoner, but rather provided that a person must be allowed to appear in person before the hearing officer. On the other hand, *Whitesides* did not involve the fundamental right to the care and custody of one's own child. The interest at stake in potential termination of that right may not always lead to a decision that a "prisoner's personal appearance is essential to the just disposition of the action." [6] But it should in many cases. Where security risks or other extraordinary circumstances are absent, the due process clause dictates that a just disposition in a parental rights termination trial includes permitting requested in-person testimony.

---

**2.** *Id.*

**3.** *Richard B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 71 P.3d 811, 827 (Alaska 2003).

