*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| TARA R., | ) | |
| | ) | Supreme Court Nos. S-18586/18595/ |
| Appellant, | ) | 18596 (consolidated) |
| | ) | |
| v. | ) | Superior Court No. 3AN-20-00295 CN |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | O P I N I O N |
| OF FAMILY & COMMUNITY | ) | |
| SERVICES, OFFICE OF | ) | No. 7680 – January 12, 2024 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF FAMILY & COMMUNITY | ) | |
| SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| C.B. and M.T., | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |
| DAN J., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF FAMILY & COMMUNITY | ) | |

SERVICES, OFFICE OF            )
CHILDREN'S SERVICES,          )
                              )
                Appellee.     )
                              )
_____)

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Adolf V. Zeman, Judge.

Appearances:  Laura Wolff, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska, Appellant in S-18595 and Appellee in S-18586/18596.  Dan Bair, Anchorage, for Appellant Tara R.  Katrina Larsen, Ketchikan, for Appellant Dan J.  Margaret McWilliams, Assistant Public Advocate, Juneau, and James Stinson, Public Advocate, Anchorage, for Guardian ad Litem.  Goriune Dudukgian and James J. Davis, Jr., Northern Justice Project, LLC, Anchorage, for Appellees C.B. and M.T.

Maassen, Chief Justice, Carney, Borghesan, and Pate, Justices, and Winfree, Senior Justice.[*] [Henderson, Justice, not participating.]

CARNEY, Justice.

## I.    INTRODUCTION

The Office of Children's Services (OCS) took emergency custody of a baby who tested positive for illicit drugs at birth and placed the baby in a foster home. OCS filed a petition to terminate parental rights about a year later.  Both parents expressed interest in voluntarily relinquishing their parental rights, but the superior court determined that because their later signed forms were not dated or signed by an OCS witness, the relinquishments were not valid.

---

[*]    Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

OCS subsequently gave notice that it planned to move the child from the foster home to her maternal aunt's home. The foster parents opposed and moved to intervene to request a placement review hearing. The court granted the motion for that limited purpose. After an evidentiary hearing the court concluded that OCS abused its discretion when it decided to move the child.

Following the court's placement review decision, the mother moved to withdraw her putative relinquishment. The court granted her motion.

The foster parents then filed a motion to reconsider the order allowing the mother to withdraw her relinquishment. The court granted the foster parents' motion and reversed its order withdrawing the relinquishment. The court then terminated the parental rights of both parents without holding an evidentiary hearing.

OCS and both parents appealed the superior court's decisions. They ask us to determine whether the foster parents were properly allowed to intervene regarding the relinquishment of parental rights; whether it was error to terminate parental rights; and whether *State, Department of Health & Social Services, Office of Children's Services v. Zander B.*[1] should be overruled. Because it was error to allow the foster parents' continued intervention, to reinstate the relinquishments, and to terminate parental rights, we vacated all the orders relating to those errors and remanded to the superior court for further proceedings.

We issued a subsequent order in response to the superior court's request for clarification regarding appropriate further proceedings. In that order we clarified that it was an abuse of discretion to either implicitly or explicitly permit the foster parents to continue to intervene regarding the validity of the parents' relinquishments; that it would be a continuing abuse of discretion to allow them to participate in any aspect of this case addressing the termination of parental rights; that it was an additional

---

[1]     474 P.3d 1153 (Alaska 2020).

abuse of discretion to revisit the validity of the relinquishments when OCS had determined that it was no longer seeking to terminate parental rights; and finally that it was an abuse of discretion to issue termination orders without providing the parties with notice and an opportunity to be heard, as well as a legal error to issue a termination order without making a best interests finding.[2]

We also explained that to the extent the superior court may have considered or relied upon an adoption statute, AS 47.10.111(d), to permit the foster parents' continued intervention, the court committed legal error.

We now provide additional explanation of our orders.

## II. FACTS AND PROCEEDINGS

### A. Facts

Tara R.[3] gave birth to a daughter in May 2020. After receiving a report that Tara used drugs while she was pregnant and that the baby tested positive for opiates and amphetamines, OCS took emergency custody of the baby. OCS also determined that the baby's father, Dan J., was not an appropriate placement for her. After two weeks in the hospital withdrawing from drugs, the baby was placed in foster care with the Tates, who are not related to her. Within a month the Tates told OCS that they were interested in adopting the baby. In May 2022 they filed a petition to adopt her.

The child has a number of medical challenges and developmental delays because of her exposure to drugs. She has a speech delay, has difficulty walking due to uneven development of her limbs, and needs to eat small amounts of food at frequent intervals through the day. The Tates arranged their schedule to address her needs, including feeding her every hour.

---

[2] OCS asks that we overrule *Zander B.*, but in light of our orders, we see no need to address that issue.

[3] We use pseudonyms to protect the parties' privacy.

OCS continued to seek relatives who could care for the child even though it had placed her with the Tates.[4] OCS considered Tara's sister Tessy, but her live-in partner had a criminal history that prevented OCS from placing the child in their home. OCS arranged for Tessy to have supervised visits with the child throughout 2021 and 2022.

## B. Proceedings

OCS filed a petition to terminate Tara's and Dan's parental rights in September 2021. The termination trial began on February 7, 2022, by video conference. Neither parent was able to use the video feature, so they participated only by telephone. Tara and Dan both stated that they intended to relinquish their parental rights by signing relinquishment forms prepared by OCS. They confirmed under oath that they wanted to relinquish their rights. The court informed the parents that they needed to sign the relinquishment forms either in the presence of the court or in the presence of an OCS worker. The court also informed them that they had 10 days to withdraw their relinquishments if they changed their minds.

The court then addressed each parent separately to confirm that each of them was knowingly and voluntarily choosing to relinquish parental rights. The assigned OCS caseworker offered to meet with the parents to have them sign the forms in his presence. The court therefore ordered both parents to sign in the presence of the caseworker when the caseworker brought the documents to them.

The court next made permanency findings. The court found that the child continued to be in need of aid, that OCS had made reasonable efforts to reunify the

---

[4] AS 47.14.100(e)(3) ranks preferences for out-of-home placements for children in OCS custody, beginning with adult family members.

family, and that it was making reasonable efforts to finalize a permanency plan, which OCS had advised had a "single goal of adoption."[5]

Tara's and Dan's relinquishment forms were filed with the court in February. Each relinquishment form was signed by a parent, but not dated or witnessed by an OCS representative.

Later that month OCS provided the Tates notice that it intended to move the child to Tessy's home. The Tates requested a placement review hearing. Tara opposed the request. The Tates replied that Tara no longer had parental rights and lacked standing to oppose their motion, and that the planned move was an abuse of OCS's discretion.

In March the court issued a notice regarding the relinquishment forms. The notice informed the parties that "the Court [could not] verify either the signature of the individuals as the people who appeared on record, or alternately the date of the signature to show that it was done on the same day as the hearing," because the relinquishment forms were not dated or witnessed by OCS. The court stated it would not sign the termination orders until the issue was resolved.

### 1. Foster parents' motion to intervene in the placement decision

After OCS notified them of its decision to place the child with Tessy, the Tates moved to intervene "[f]or the limited purpose of challenging OCS's decision to move [the child] to the maternal aunt," citing *Zander B.* and Alaska Civil Rule 24.[6] They attached an affidavit from Ms. Tate to their reply, asserting that Tessy was an inappropriate placement because her partner, who had died in October, had a criminal history. She claimed Tessy's partner died from a drug overdose at home and alleged

---

[5]    AS 47.10.011 (requiring court to establish child is in need of aid by preponderance of the evidence).

[6]    474 P.3d 1153, 1163-64 (Alaska 2020) (permitting foster parent intervention as "the rare exception rather than the rule"); Alaska R. Civ. P. 24 (outlining procedure for intervention).

that Tessy's relationship with him "exemplif[ied] terrible judgment" and disregard for her own children's safety. She also claimed Tessy had never visited or developed "any sort of relationship" with her niece.

The court found that the Tates "ha[d] a sufficient interest . . . to be permitted to intervene for the limited purpose of requesting a placement review." Tara filed a motion for reconsideration, arguing that the court misapplied *Zander B.* and the intervention would unduly delay the placement, which would "adversely affect the time that is needed for strengthening the bond between the child's maternal aunt and the child." The Tates opposed reconsideration, arguing that they were the "only two people . . . fully aware of the needs of th[e] child." They argued that because Tara would not disclose "the profound dysfunction and danger in the maternal aunt's home," they were the only people who could describe the relationship between the aunt and the child. Tara argued in reply that "[t]he facts in this case [were] clearly distinguishable from *Zander B.*" and allowing intervention "disrupts the scheme that has been carefully laid out for CINA cases."

The court denied the motion for reconsideration. It reasoned that although the Tates did "not explicitly indicate that they are privy to evidence in the possession of nobody else," as in *Zander B.*, "there is an alleged risk to the wellbeing of the child if the familial placement goes through." The court found "that, at a minimum, the foster parents have the standing to intervene and make their case."

Following the order on reconsideration, OCS asked for leave to amend its response to support Tara's motion for reconsideration, which the court granted. OCS argued that "the foster parents['] representation does not include specific evidence about the proposed placement that the court would not get from another party" and that the intervention "subvert[ed] the purpose of child protection law."

OCS pointed out that a guardian ad litem (GAL) — a "separate and distinct . . . . specialized person" — had been appointed to "best guard the child's best

interest."[7] It noted that "the GAL was already aware of many of the allegations posited by the foster parents" and that if "the transfer . . . were not in the child's best interest the . . . [GAL] could and would request a hearing at which time the foster parents would likely be called to testify as to their views on the matter."

In May 2022 Tessy moved to intervene. She attached an affidavit in which she denied Ms. Tate's claims about her and her former partner and pointed out that if these claims were true, she would have lost her foster care license as well as custody of Tara's other daughter, who was placed in her care.

### 2.  Placement review hearing

After a scheduling hearing in March 2022, the case was reassigned to a different judge. A placement review hearing was held over three days in June and July. At the beginning of the hearing the court permitted Tessy to intervene.

The Tates called a mental health therapist licensed in Washington as an expert witness. The therapist testified that the child appeared to suffer from neonatal abstinence syndrome[8] and that moving her out of the Tates' home could adversely affect the child. She also testified that she did not believe there was any "direct benefit" to placing a child with family members or siblings if the child did not "have a previously established relationship with" them.

Mr. Tate testified that he was the child's primary caregiver and described their daily routine, emphasizing how much time was needed to properly care for the

---

[7] *See* AS 25.24.310(c) (requiring court to appoint GAL "when . . . representation of the child's best interests . . . would serve the welfare of the child"); AS 47.10.050 (providing for appointment of GAL in CINA cases "under the terms of AS 25.24.310"); CINA Rule 2(e) (defining GAL as "a person appointed by the court to represent the best interests of the child in the CINA proceeding").

[8] *See* Karen McQueen & Jodie Murphy-Oikonen, *Neonatal Abstinence Syndrome*, 375 NEW ENG. J. MED. 2468, 2469 (2016) ("The neonatal abstinence syndrome refers to a postnatal opioid withdrawal syndrome that can occur in 55 to 94% of newborns whose mothers were addicted to or treated with opioids while pregnant.").

child. When questioned on cross-examination about whether he had seen the parents' relinquishment forms, he replied that he knew "the relinquishment paperwork was done, but it was done improperly . . . so that paperwork was thrown out."

The OCS caseworker testified that he had evaluated Tessy's home and confirmed that the child had not been placed with her while she was dating her former partner because of his criminal record. The caseworker testified that he now believed that Tessy could meet the child's needs. He testified that it was normal OCS practice to move a child from a foster home to an available family member once a barrier to placement, such as Tessy's partner and his criminal record, was removed. He also testified that the Tates "disagreed with" OCS's decision and "were unwilling to allow [the child] to spend time with her aunt alone."

Tessy testified and denied the allegations in the foster mother's affidavit. She testified that her former partner had not displayed any behaviors that indicated he was using drugs after 2020, that he had been sick for a week prior to his death, and that the police report listed his cause of death as undetermined. She described the classes and training she completed to better care for her autistic son, and testified that she would make sure that she met her niece's needs.

Ms. Tate then testified about the child's needs, and how she and her partner had not been away from her during the nearly two years the child had been with them. She testified that she had based her affidavit on police reports she had obtained and information she learned "[t]hrough my employment with the District Attorney's Office."

The court granted the Tates' motion staying the OCS placement decision in August. It found "clear and convincing evidence of good cause to deviate from the familial statutory preferences that otherwise govern placement" because Tessy "would have difficulty effectively addressing [the child's] needs." The court found the Tates' testimony credible. It also found that OCS had decided to move the child to Tessy "without meaningfully making any effort to truly understand [the child's] needs and

whether the new placement would be able to meet those needs." The court concluded that OCS abused its discretion and stayed the child's placement.

### 3. Motions for reconsideration and to withdraw relinquishment

Tara filed a motion for reconsideration, asking the court to take into account the statutory preference for preserving sibling relationships, pointing out that OCS had placed the child's younger sibling with Tessy.[9] Tara also moved to withdraw her relinquishment, explaining that six months had passed since the court's notice and no updated relinquishment with an OCS signature had been filed. None of the other parties — OCS, the GAL, or Dan — opposed Tara's motion. The court granted Tara's unopposed motion to withdraw her relinquishment in August.

In September the Tates filed an opposition to Tara's motion for reconsideration, arguing that the child and her sister "ha[d] no relationship whatsoever." They also filed a motion to reconsider the order granting withdrawal of Tara's relinquishment. The Tates argued that they were "not properly served," that they would have opposed the motion had they been served, and that there was no legal or factual basis for Tara's motion. They requested a hearing "to develop a record [about] whether the factual assertions in [Tara's] motion are correct and whether the signed relinquishment is valid as a matter of law."

Tara responded that the court had allowed the Tates to intervene only for the limited purpose of requesting a placement review and "[t]he request for withdrawal of a relinquishment is a different process in this matter." She noted that the court had "flatly affirmed that it 'will not sign the order terminating parental rights' unless 'th[e] issue [of providing a copy of the relinquishment signed and dated by an OCS representative] is resolved.' " Tara continued that "[i]t is undisputed that the issue had not been resolved" because her relinquishment did not show that it was signed in the

---

**9** *See* AS 47.10.080(w) ("The court shall recognize a presumption that maintenance of a sibling relationship . . . is in a child's best interest.").

presence of an OCS representative as required by AS 47.10.089(b).[10] OCS responded that the foster parents lacked standing to oppose Tara's motion to withdraw her relinquishment and that allowing them to intervene to do so would breach the confidentiality of CINA proceedings. It also argued that the court in its notice had already determined the validity of the relinquishment.

The court held status hearings in October and November. In October OCS notified the court that it intended to create a reunification plan. The Tates argued that the parents' relinquishments were valid if signed in the presence of an OCS representative, but they also argued that the court needed additional evidence to make a final determination. In November OCS advised the court that Tara was "case plan compliant" and that she had begun a trial home visit with the child's sister. It also told the court that the Tates were not cooperating with OCS's attempts to arrange unsupervised visits between Tessy and the child. The GAL advised the court that following a recent team decision meeting the parties agreed to extended visitation and transition planning for the child's move to Tessy's home, but they "haven't occurred yet." The GAL noted some frustration and stated there needed to be "some forward momentum on this case."

A week after the November status hearing, without holding another hearing, the court vacated its previous order and "confirmed" that Tara's and Dan's relinquishments were valid. In the same order the court "confirmed" that the Tates' intervention was ongoing and allowed them to participate in the case and to oppose Tara's motion to withdraw her relinquishment. The court cited *Zander B.* and Rule 24 in support of its decision. Although the court acknowledged that in *Zander B.* we had

---

[10]     AS 47.10.089(b) ("A voluntary relinquishment must be in writing and signed by a parent, regardless of the age of the parent, in the presence of a representative of the department or in the presence of a court of competent jurisdiction with the knowledge and approval of the department.").

specifically cautioned that allowing foster parents to intervene to argue for the termination of parental rights was not appropriate, it concluded that this was "the rare case in which the trial court reasonably decides that foster parents have *relevant* evidence it is not likely to receive from the existing parties."[11]

The court found that Tara's "relinquishment shares a question of law or facts in common with the placement review hearing" because its validity would mean that Tara was no longer a party to the CINA case. It added that because the Tates' adoption petition was stayed "as a result of both the litigation regarding the placement review and the remaining relinquishment issues, the outcome of their adoption case share[d] questions of law or facts with the issue of the voluntary relinquishments." The court found that neither Tara nor Dan had done anything "to signal a desire to revoke their relinquishments within the ten-day statutory period and it is clear from the Record that the Court advised them of their ability to do so." The court noted that Tara's progress was "commendable," but because the child's "permanency . . . must be the focus," it terminated Tara's and Dan's parental rights.

Tara and Dan both appeal the termination of their parental rights. In addition Dan argues that the superior court erred by confirming the voluntary relinquishments. OCS appeals the termination of Tara's parental rights and argues that the court abused its discretion by allowing the Tates to intervene to contest the withdrawal of Tara's relinquishment. The GAL is aligned with the appellants and similarly argues that the superior court erred in terminating parental rights and enforcing the relinquishments without providing due notice or making a best interests finding.[12] We granted OCS's motion to consolidate the appeals.

---

[11]    474 P.3d 1153, 1170-71 (Alaska 2020) (emphasis in original).

[12]    The GAL is designated as an appellee by rule. Alaska Appellate Rule 204(g) requires that all parties except those "who file[] a notice of appeal . . . . are

## III. STANDARD OF REVIEW

We review a superior court's grant or denial of a motion for permissive intervention for abuse of discretion.[13] "A decision constitutes abuse of discretion if it is 'arbitrary, capricious, manifestly unreasonable, or . . . stems from an improper motive.' "[14]

"Whether a parent's due process rights were violated in a termination proceeding is a question of law," which we review using our independent judgment.[15]

"Whether the trial court's findings comport with the requirements of the CINA statutes and rules is a question of law" to which we apply our independent judgment.[16] Statutory interpretation also "raises questions of law to which we apply our independent judgment."[17]

## IV. DISCUSSION

Underlying this consolidated appeal are disagreements about the scope and application of our decision in *State, Department of Health and Social Services, Office of Children's Services v. Zander B.*[18] In *Zander B.* the superior court permitted foster parents to intervene in a CINA case to contest OCS's plan to move a child to his

---

deemed to be appellees, regardless of their status in the trial court." The GAL was also aligned with Tara, Dan, and OCS at trial.

[13]     *Zander B.*, 474 P.3d at 1162.

[14]     *Id.* (alteration in original) (quoting *del Rosario v. Clare*, 378 P.3d 380, 383 (Alaska 2016)).

[15]     *Alyssa B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 165 P.3d 605, 614 (Alaska 2007).

[16]     *Zander B.*, 474 P.3d at 1162 (quoting *S.S.M. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 3 P.3d 342, 344 (Alaska 2000)).

[17]     *Id.*

[18]     474 P.3d 1153.

grandmother's home.[19]  The court held a placement review hearing[20] and concluded that OCS had abused its discretion when it decided to move the child.[21]  OCS appealed.[22]  We determined that, in light of the specific circumstances presented in that case, the superior court had not abused its discretion by permitting the foster parents to intervene.[23]  But we made clear that "[f]oster parent intervention should . . . be the rare exception rather than the rule."[24]

Here the superior court relied on *Zander B.* to permit the foster parents' continued intervention after they successfully challenged OCS's intended transfer of the child.  OCS, the parents, and the GAL argue that this was error.  We agree that *Zander B.* did not permit the continued intervention granted in this case.  We therefore vacated the Order Confirming Biological Parents' Voluntary Relinquishments and Foster Parents' Intervention; the Order and Judgment Terminating Parental Rights and Responsibilities of the Mother; and the Order and Judgment Terminating Parental Rights and Responsibilities of the Father.[25]

## A. The Superior Court Abused Its Discretion By Allowing Continued Intervention By The Foster Parents.

When it granted the Tates' motion to intervene in March 2022, the superior court entitled its order "Order Granting Limited Intervention."  The order explicitly stated that the foster parents were being "permitted to intervene for the limited

---

[19]  *Id.* at 1157-58.

[20]  *See* CINA Rule 3; AS 47.10.070 (describing hearing requirements and procedures).

[21]  *Zander B.*, 474 P.3d at 1161.

[22]  *Id.* at 1161-62.

[23]  *Id.* at 1164-65.

[24]  *Id.* at 1164.

[25]  Because *Zander B.* does not allow the extensive intervention granted the foster parents, we do not reach the parties' additional arguments.

purpose of requesting a placement review [hearing]." No one challenges this order, which appears to be in keeping with *Zander B.* The superior court agreed with the Tates and stayed the proposed change in placement in August, after which the purpose of their limited intervention had been achieved.[26]

But in September the superior court accepted the Tates' late-filed opposition to Tara's motion to reconsider the stay of placement. It also allowed the Tates to file a motion to reconsider the order granting Tara's motion to withdraw her relinquishment, in which they claimed that the court had failed to "properly serve" them with the order.

Tara, Dan, OCS, and the GAL argue that the court erred by permitting the Tates to participate as parties "beyond the scope of their limited permissive intervention." We agree.

### 1. Intervention was permitted only for the limited purpose of the placement review hearing.

In *Zander B.* we affirmed the superior court's order allowing foster parents "to intervene . . . for the limited purpose of challenging the decision to place [the child] with [his grandmother]."[27] We also specifically noted that the court's written order permitting the foster parents "to intervene in any placement review hearing regarding [the child] . . . was clearly overbroad."[28] And while we recognized that there could be unusual cases in which intervention could be proper, we also stated that "allowing foster parents to intervene as a matter of course would be contrary to the goals of the CINA

---

[26] This did not end the Tates' ability to participate in subsequent proceedings. As the dissent in *Zander B.* noted, the existing CINA rules allow foster parents to "participate in many aspects of a CINA case, but not as a party." *Zander B.*, 474 P.3d at 1177 (Winfree, J., dissenting).

[27] *Id.* at 1164 (majority opinion).

[28] *Id.* at 1164 n.29.

statutes."[29]  We held that "[f]oster parent intervention should therefore be the rare exception."[30]  After noting that neither their status as "pre-adoptive" foster parents nor their attachment to nor their future plans for the child were reason to allow intervention, we concluded that "[w]hat sets this case apart is the foster parents' representation that they had specific evidence about *the proposed placement* that the court was not going to receive from any existing party."[31]

In this case the court granted the Tates "limited intervention" to contest the proposed placement with Tessy based on the specific allegations in Ms. Tate's affidavit.  After an evidentiary hearing at which the Tates presented and Tara and Tessy disputed those allegations, the superior court ruled in favor of the Tates and stayed OCS's placement decision.  Once the superior court resolved the proposed placement, including Tara's motion for reconsideration,[32] the purpose of the Tates' limited intervention was achieved.[33]

If the Tates wished to participate beyond the limited intervention they had been granted, they needed to request permission to do so under Civil Rule 24(b).  They failed to do so.  And as we observed in *Zander B.*, the rule requires foster parents to demonstrate both "[a] common question of law or fact" with the underlying case and that their intervention "will [not] unduly delay or prejudice the adjudication of the rights of the original parties."[34]

---

[29]     *Id.* at 1163.

[30]     *Id.* at 1164.

[31]     *Id.* at 1164-65 (emphasis in original).

[32]     Although the superior court did not rule on this motion, under Alaska Civil Rule 77(k), a motion not ruled upon within 30 days of the date of filing, or of the filing of a response, is taken as denied.

[33]     *See Zander B.*, 474 P.3d at 1164 n.29 (cautioning courts to limit foster parent intervention to "*specific* upcoming proceedings" (emphasis added)).

[34]     *Id.* at 1164.

In its November 2022 order, the superior court concluded that the Tates' continued intervention was permitted because Tara's withdrawal of her relinquishment shared a common question of law or fact with the placement review hearing. The court stated that if Tara's relinquishment were valid, "then she no longer has any parental rights concerning [the child], [the child] will not be placed with her in [the] future, and [Tara] is not a party to any subsequent proceedings." The court added that because the foster parents had filed an adoption petition, "the outcome of their adoption case share[d] questions of law or fact[] with the issue of the voluntary relinquishments."

It was an abuse of discretion to allow the Tates' continued intervention despite their failure to request intervention under Civil Rule 24(b). And it was an abuse of discretion to equate the Tates' further participation in separate matters with the placement review hearing at which they had prevailed. In *Zander B.* we noted that the superior court's order allowing those foster parents to participate in *any* placement review hearing regarding the child was "clearly overbroad."[35] We cautioned courts "to limit foster parent intervention to specific upcoming proceedings."[36] Whether Tara's (or Dan's) relinquishment was legally valid — despite the superior court's previous ruling that they were not — has no question of law or fact in common with the Tates' intervention to present "specific evidence about *the proposed placement* that the court was not going to receive from any existing party."[37] We stated in *Zander B.* that "we cannot . . . conceive of a situation in which foster parent intervention in a CINA case would be appropriate when the foster parents' purpose was to argue for the termination of parental rights."[38] We still cannot conceive of such a case. Yet that is precisely what the Tates were permitted to do, and they again achieved their purpose. It was an abuse

---

[35]    *Id.* at 1164 n.29.

[36]    *Id.*

[37]    *See id.* at 1165 (emphasis in original).

[38]    *Id*. at 1170.

of discretion to permit the Tates to participate as parties in this case far beyond the limited role allowed by *Zander B.*

## B. It Was A Violation Of The Parents' Due Process Rights To Terminate Parental Rights Without Notice Or An Opportunity To Be Heard.

Despite the parties' arguments that more evidence was needed before the court could decide whether Tara's relinquishment was valid and despite its own recognition that it would need to schedule an evidentiary hearing before making a decision, the superior court issued an order "confirming" both parents' relinquishments and the Tates' continued participation to litigate that issue. In the same order, issued a week after the last status hearing, the court terminated Tara's and Dan's parental rights. Making those decisions and ordering the termination of parental rights violated the parents' due process rights.[39]

The most basic requirements for due process are notice and an opportunity to be heard.[40] The superior court provided neither before issuing its order. No party disputes that parental rights are rights of the highest importance — among "the most

---

[39]     The GAL also argues the earlier determination was the "law of the case" and therefore binding within these proceedings. *See Jones v. Jones*, 505 P.3d 224, 231 (Alaska 2022). But application of the "law of the case" doctrine is discretionary and requires the issue to have been decided in something like a final, appealable judgment. *See id.*; *Wolff v. Arctic Bowl, Inc.*, 560 P.2d 758, 763 (Alaska 1977). The law of the case doctrine does not apply here.

[40]     *In re the 2021 Redistricting Cases*, 528 P.3d 40, 58 (Alaska 2023) (quoting *Haggblom v. City of Dillingham*, 191 P.3d 991, 995 (Alaska 2008)). We use the United States Supreme Court's test from *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976), to analyze due process claims. We consider three factors: the private interest affected by the official action, the risk of erroneous deprivation and the probable value of additional or substitute procedural safeguards, and "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Sarah A. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 427 P.3d 771, 778 (Alaska 2018) (quoting *D.M. v. State, Div. of Fam. & Youth Servs.*, 995 P.2d 205, 212 (Alaska 2000)).

basic of all civil liberties."[41]  Because of their importance we have held "that proceedings to terminate parental rights implicate fundamental interests comparable with those at stake in a criminal prosecution."[42]  The proceedings in which parental rights are at stake thus require according the parents due process commensurate with their importance.

Yet, in spite of the fundamental importance of Tara's and Dan's parental rights, the superior court provided no notice to any party of its intentions to reverse the previous determination that the relinquishments were not valid; to allow the Tates — who had not requested to participate after the placement review hearing — to continue to participate and to advocate for the termination of parental rights; and to terminate Tara's and Dan's parental rights.  The superior court did not convene an evidentiary hearing or termination trial; it provided no opportunity for Tara and Dan to be heard.

The parents were deprived of their rights to due process of law under both the Alaska and United States Constitutions before their parental rights could be terminated.

## C. It Was Legal Error To Order Termination Of Parental Rights Without Making Best Interests Findings.

Alaska Statute 47.10.089(e) requires the superior court to "determine[] . . . that termination of parental rights under the terms of the relinquishment is in the child's best interest"[43] before it can accept a parent's relinquishment or terminate parental

---

[41]    *Seth D. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1222, 1227-28 (Alaska 2008).

[42]    *In re A.S.W.*, 834 P.2d 801, 806 (Alaska 1992).

[43]    AS 47.10.089(e).

rights based upon it. If the court determines that termination of a parent's rights would not be in the child's best interests for some reason, it may not terminate rights.[44]

By the time of the court's November 2022 order, nine months had passed since the putative relinquishments were first presented to the court. OCS no longer sought to terminate Tara's and Dan's parental rights; in fact, it opposed termination and the Tates' continued participation in the case. OCS was seeking to reunify the family and had already returned Tara's younger child to her on a trial home visit after first placing the child with Tessy.

There is no indication in the order or the record before us that the superior court considered the child's best interests in light of the changes that occurred in the months leading up to the order. In fact, the order itself does not include any best interests finding at all. This was legal error.

### D. Alaska Statute 47.10.111(d) Does Not Authorize The Foster Parents' Continued Intervention.

The Tates additionally assert that the superior court properly authorized their continued intervention based on AS 47.10.111(d).[45] Prior to the statute's passage in 2016, adoption proceedings, CINA proceedings, and other related proceedings often occurred in different courts at different times — an inefficient process that frequently delayed permanency for children in state custody.[46] The legislature enacted this statute

---

[44] At oral argument before us, the GAL offered a number of examples why a court could determine that termination was not in the child's best interests. Among them were the child opposing termination; the child's connection to other family members; or that a parent's relinquishment was motivated by a desire to avoid child support.

[45] AS 47.10.111(d) (providing petitioner in adoption proceeding does not become party to CINA proceeding, but may participate in proceedings that "concern" petition).

[46] *See* Minutes, H. Health & Soc. Servs. Comm. Hearing on H.B. 200, 29th Leg., 1st Sess. 3:11:30-3:13:15 (Mar. 29, 2016) (statement of Christy Lawton, Dir., Off. of Child's Servs.).

in order to require a "one judge, one child, one family" approach to children's cases mandating that all the hearings would be held before the judge assigned to the CINA case.[47] The statute first requires that "if a person seeks adoption or appointment as legal guardian of a child in state custody . . . , the court shall hear the adoption or guardianship proceedings as part of the child-in-need-of-aid proceedings relating to that child."[48] But the statute also clarifies that "[a] person who files a petition for adoption or legal guardianship of a child under this section *does not become a party* to the child-in-need-of-aid proceedings."[49] The statute creates a limited exception for a person who has filed a petition for adoption:  that person "may only participate in proceedings under this chapter that concern the person's petition."[50]

We reject the Tates' argument.  First, they did not file an adoption petition until May 2022, months after the placement review hearing had been held.  And we reiterate that the designation of a foster home as "pre-adoptive" does not have significance outside of signifying OCS's current intention.[51]  The statute is thus irrelevant to the superior court's order granting limited intervention.

Second, the Tates' interpretation of the statute would turn its purpose upside down.  The statute establishes that "[a] person who files a petition . . . *does not become a party*" to the CINA case; it then allows for limited "*participat[ion]*" in

---

[47]     *See id.*

[48]     AS 47.10.111(a).

[49]     AS 47.10.111(d) (emphasis added).

[50]     *Id.*

[51]     *See Dara S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 426 P.3d 975, 999 (Alaska 2018); *see also State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Zander B.*, 474 P.3d 1153, 1177 n.21 (Alaska 2020) (Winfree, J., dissenting) (calling such labels "nothing other than descriptive labels for foster placements").

proceedings . . . that concern the person's petition."[52]  Yet the foster parents would have us apply the exception to eviscerate the rule.  Their argument that their continued intervention is appropriate because it "concerns" their petition strains the common meaning of "concerns."[53]  In keeping with the statute's purpose, AS 47.10.111(d) recognizes that a petition for adoption may be discussed alongside something like a relinquishment.  And its guarantee of participation rights for "proceedings . . . that concern the person's petition" ensures that such a petitioner is notified of and can be heard in CINA proceedings that directly affect a concrete aspect of the adoption proceeding, like scheduling a hearing date.  But nothing in this provision allows the granted participation to overcome the statute's prohibition of granting party status to a petitioner merely because the petitioner is present at a hearing.

To the extent AS 47.10.111(d) was a basis for the superior court's order permitting the Tates' continued intervention and participation as parties, it was legal error.

## V.   CONCLUSION

We VACATE the Order Confirming Biological Parents' Voluntary Relinquishments and Foster Parents' Intervention; the Order and Judgment Terminating Parental Rights and Responsibilities of the Mother; and the Order and Judgment Terminating Parental Rights and Responsibilities of the Father and REMAND to the superior court for further proceedings.

---

[52]   AS 47.10.111(d) (emphasis added).

[53]   At oral argument before us the Tates' attorney asserted that intervention was proper because the later motions "affect[ed]" their petition.  But we presume that the legislature purposefully chooses the words it uses in statutes and it did not use "affect."